### In re Will Clay PERRY, Debtor.

David Wallace, Costa Bajjali, Jacquelyn Marie Wallace 1996 Sub–S Trust and Whitney Leigh Wallace 1996 Sub–S Trust, Plaintiffs,

v.

Will Clay Perry, Defendant.

Bankruptcy No. 08–32362–H4–11.
Adversary No. 08–03299.

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Feb. 3, 2010.

Johnie J. Patterson, Walker & Patterson, P.C., Houston, TX, for Plaintiffs.

John Wesley Wauson, Matthew Brian Probus, Wauson Probus, Sugar Land, TX, for Defendant.

## MEMORANDUM OPINION RELATING TO COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

[Adv. Docket No. 1]

JEFF BOHM, Bankruptcy Judge.

### I. INTRODUCTION

This Memorandum Opinion relates to a lengthy, multi-day trial over a dischargeability complaint involving numerous state law issues. These issues include, but are not limited to, breach of contract and state law defamation claims. The Court makes

1. Reference to a "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure. Any reference herein to "the Code" refers to the United States Bankruptcy Code. Further, reference to any section (i.e. § ) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code. Reference to a

the following findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052.[1] To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such. Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such. The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

### II. BRIEF PROCEDURAL BACKGROUND

On August 20, 2008, the plaintiffs filed their Complaint to Determine Dischargeability of Debt. [Adv. Docket No. 1.] The plaintiffs brought this suit under § 523(a)(2), (4), & (6). However, in an order issued by this Court on March 17, 2009, sanctioning the plaintiffs for discovery abuse, this Court struck all causes of action concerning dischargeability brought under §§ 523(a)(2) & (a)(4); hence, the only manner in which the plaintiffs could obtain a judgment of nondischargeability in this adversary proceeding would be to successfully prove the elements of § 523(a)(6). [Adv. Docket No. 37.] The trial in this suit was therefore whether the defendant (who is the debtor in the main case) owes debts to the plaintiffs based upon breach of contract (failure to abide by a nondisparagement clause and failure to indemnify), defamation, breach of fiduciary duty, and fraud, and whether such debts are non-dischargeable because they arose due to the debtor's willful and malicious injury of the plaintiffs.[2]

"Rule" refers to the Federal Rules of Civil Procedure.

2. The Court wishes to make clear that this Court sanctioned the plaintiffs due to misconduct of their initial counsel of record, whom the plaintiffs replaced with Johnie J. Patterson. [Adv. Docket No. 25.] Mr. Patterson's conduct throughout his representation of the

The trial in this case lasted twelve days. Specifically, trial was held on the following days in 2009: June 1, June 2, June 3, June 4, June 5, June 19, June 23, June 24, June 25, July 14, July 20, and July 24.

## III. Findings of Fact

### A. General Background

1. On or about October 22, 2004, Will Clay Perry (Perry or the Debtor) and Costa Bajjali (Bajjali) became partners in W.C. Perry Properties, LP (Perry Properties or the Partnership). [Adv. Docket No. 87, p. 13, ¶ V.—A.]

2. In January of 2005, the Jacquelyn Marie Wallace 1996 Sub–S Trust and the Whitney Leigh Wallace 1996 Sub–S Trust (collectively, the Wallace Trusts) also became partners in Perry Properties. Jacquelyn Marie Wallace and Whitney Leigh Wallace are the daughters of David Wallace (Wallace), one of the plaintiffs in this adversary proceeding number 08–03299 (the Adversary Proceeding). Each trust held a one-sixth (1/6) partnership interest in Perry Properties. Thus, collectively, the Wallace Trusts held a one-third 1/3 partnership interest in Perry Properties, as evidenced by the January, 2005 partnership agreement (the Partnership Agreement). [Adv. Docket No. 87, p. 13, ¶ V.—B.] Wallace himself was never a partner in Perry Properties, either before or after the Wallace Trusts became partners. [Pls.' Ex. Nos. 2 & 3.]

3. While they were partners, Perry and Bajjali entered into two agreements regarding a certain tract of real estate known as the Imperial property (the Imperial Property).[3] As part of the Imperial Property transaction (the Imperial Property Transaction), Perry signed and executed a $50,000.00 note payable to Bajjali. [Adv. Docket No. 87, p. 13, ¶ V.—D.]

4. Effective on November 15, 2006, Perry purchased all of the partnership interests in Perry Properties owned by Bajjali and the Wallace Trusts, the details of which are set forth in a signed purchase agreement (the Purchase Agreement). [Adv. Docket No. 87, p. 13, ¶ V.—C] The Purchase Agreement defines Bajjali and the Wallace Trusts as "Sellers." [Pls.' Ex. No. 4, p. 1, ¶ 5, pp. 8–10.] When he testified at trial, Wallace admitted that the Purchase Agreement did not involve him as a partner. [June 23, 2009 Tr. 109:17–19.] Moreover, Wallace admitted that when he filed his proof of claim, he did not have a guaranty from Perry. [June 23, 2009 Tr. 123:3–13.]

5. Effective on November 14, 2006, Perry, in his capacity as manager of W.C. Perry Real Estate Group, L.L.C. (the Perry Group), executed the Agreement Regarding Origination Fees (the Origination Agreement), relating to the Imperial Property Transaction. [Adv. Docket No. 87, p. 13, ¶ V.—E.] Perry, in his individual capacity, guaranteed payment and performance as part of the Origination Agreement. [Adv. Docket No. 87, p. 13, ¶ V.—G.]

6. Perry filed a Chapter 11 petition on April 11, 2008. [Docket No. 1.] At that time, Wallace and Bajjali had pending causes of action in state court against Perry for defamation and breach of contract, styled: *W.C. Perry Properties, LP, et al. v. R.D. Tanner, et al.,* Cause No. 07–CV–154130, in the District Court of Fort Bend

---

plaintiffs was exemplary, as was the conduct of counsel for the defendant, John W. Wauson.

**3.** In 2004, Bajjali and Perry became partners in a real estate development venture; their first transaction was to purchase and refurbish the Imperial Sugar plant located in Fort Bend County, Texas. [June 1, 2009 Tr. 67:18–69:13.]

County, Texas, 400th Judicial District. [Adv. Docket No. 87, p. 13, ¶ V.—H.]

### B. Perry's Background and Contacts with Certain Individuals

7. Perry obtained a B.B.A. degree in business management operations and a M.B.A. in business finance from Loyola University in Chicago, Illinois. [June 1, 2009 Tr. 30:12–23.] Perry received his MBA in 1997. [June 1, 2009 Tr. 30:22–25.] Additionally, Perry has been a licensed real estate broker since the autumn of 2001. [June 1, 2009 Tr. 31:9–15.] He is a sophisticated businessman.

8. Perry has extensive experience in commercial real estate development. [June 1, 2009 Tr. 31:1–32:14.]

9. John Lunsford (Lunsford), an investor involved in radio media, met Perry, Wallace, and Bajjali while consulting for BizRadio—a Texas-based radio station specializing in business news and strategies—at an event in New York City. [June 3, 2009 Tr. 10:15—11:14.]

10. Around 2005 or 2006, Daniel Frishberg (Frishberg), a former business associate of Perry, invested substantial amounts of his clients' money with Perry Properties. [June 3, 2009 Tr. 34:9–35:20.] Frishberg, a BizRadio talk show host, is a manager of assets for individuals and institutions valued collectively at approximately $1.5 billion. Out of that amount, approximately $200 million are available to invest at Frishberg's discretion. [June 3, 2009 Tr. 33:9–17.]

11. Within Perry Properties, Perry was responsible for brokerage activities, Bajjali was responsible for the real estate development activities, and Wallace was responsible for both finance and private equity activities. [June 4, 2009 Tr. 166:22–167:2.]

12. Sylvia Hoffman (Hoffman) served as Perry's administrative assistant from February of 2006 until 2008. [June 1, 2009 Tr. 100:21–23; 102:5–6.] Based upon certain testimony adduced, and certain exhibits introduced, at trial, this Court also finds that Hoffman was Perry's confidant during her tenure as his administrative assistant.

### C. Wallace's Background and Contacts with Certain Individuals

13. Wallace has developed real estate and invested in private equity ventures for a number of years. [June 4, 2009 Tr. 161:17–20.] Indeed, with an extensive background in real estate development, Wallace has held numerous positions in investment banking companies that operate in real estate development. [June 5, 2009 Tr. 80:12–99:5.] Moreover, Wallace has dealt in the purchase and sale of troubled businesses. [June 5, 2009 Tr. 11:22–12:18.] He is a sophisticated businessman.

14. Mark Thatcher (Thatcher), the son of Margaret Thatcher, the former Prime Minister of England, had a business relationship with Wallace. Their business consisted of operating investment banks buying troubled assets, buying troubled companies, and buying bankrupt companies. As early as 2002, stories circulated that Wallace and Thatcher participated in arms sales. Wallace convincingly testified, however, that he was never aware of any arms dealings by Thatcher nor was he himself involved in arms dealings. [June 4, 2009 Tr. 181:22–182:11; June 5, 2009 Tr. 5:24–6:3; June 19, 2009 Tr. 20:21–21:17.]

15. Contrary to statements made about him, Wallace also convincingly testified that he was never involved in a plot to overthrow the government of Equatorial Guinea. [June 5, 2009 Tr. 6:4–9.] This Court finds that not only were the statements published by Perry about Wallace

involving himself in a plot to overthrow the government of Equatorial Guinea false, but all of the defamatory allegations made or published by Perry against Wallace were false.

16. Wallace met Bajjali through Perry. [June 4, 2009 Tr. 164:22–25.]

17. Wallace's political career began in May of 2001 when he was elected to the City Council of the City of Sugar Land, Texas. He then decided to run for Mayor of the City of Sugar Land against the incumbent mayor, Dean Hrbacek. Wallace subsequently received threats to himself, his family, and his business as a result of his candidacy. Despite the threats, Wallace was elected and served as mayor from 2002 to 2008. [June 4, 2009 Tr. 163:11–16; June 19, 2009 Tr. 14:21–18:19.]

18. McGrath, who has, or has had, business interests in both Houston, Harris County, Texas, and Sugar Land, Fort Bend County, Texas—for example, he is the owner of Asset Plus Corporation and a former member of the investment committee for Perry Properties—was introduced to Perry by Wallace in 2006. McGrath is a sophisticated businessman. At one point, he acted as the trustee for the Wallace Trusts. Additionally, McGrath has known Wallace for approximately fourteen years because he was a soccer coach for Wallace's daughters. McGrath also knows Bajjali through both Wallace and Perry. [June 3, 2009 Tr. 113:6–114:8; 123:11–19; 124:5–125:6.]

19. Eric Thode (Thode), former Republican Party Chairman of Fort Bend County, Texas, has known Wallace since the early 1990s through mutual political contacts. [June 3, 2009 Tr. 135:7–13.] Thode has also known Perry since 2003 or 2004 through political activities in Fort Bend County, Texas. [June 3, 2009 Tr. 134:18–135:1; 136:24–137:6.]

20. Bert Keller (Keller), a real estate consultant, met Wallace while Wallace was mayor of Sugar Land and Keller was a candidate for District G Houston City Council. [June 3, 2009 Tr. 151:11–152:4.]

### D. Bajjali's Background

21. Prior to 2004, for two years, Bajjali was the global program manager for Dell Corporation. [June 25, 2009 Tr. 107:7–13.] In 2004, Bajjali began working in the development side of real estate. [June 25, 2009 Tr. 108:10–15.] The Court finds that Bajjali is a sophisticated businessman who has a very reputable record and reputation in his professional career, and this Court finds that all of the defamatory allegations made by Perry against Bajjali to be false.

22. Bajjali testified convincingly, and this Court so finds, that he has never committed a crime, been investigated for a crime, or been indicted for a crime. [June 25, 2009 Tr. 93:16–94:1.]

### E. Bob Perry's Background

23. Bob Perry, who is Perry's father and an extremely successful businessman, has been the CEO of Perry Homes for forty-one years and has never been involved in his son's business. [June 5, 2009 Tr. 123:18–124:18.]

24. Bob Perry met Wallace while Wallace was the mayor of Sugar Land. [June 5, 2009 Tr. 131:11–18.]

25. Bob Perry does not generally discuss business, politics, or finances with his children, but would give his children advice on which political candidates to support. [June 5, 2009 Tr. 136:21–137:24.] Indeed, as soon as Perry earned his real estate brokers' license, Bob Perry kept his business separate and apart from his son's business. On rare occasions, however, Perry Homes' Land Developers, one of Bob Perry's businesses, purchased land

that Perry had brought to its attention. [June 5, 2009 Tr. 179:12–180:7.]

### F. Formation of Perry Properties

26. In approximately 2003, Perry and Bajjali were introduced to each other. In 2004, Bajjali and Perry became partners in a real estate development venture; their first deal was to purchase and refurbish the Imperial Property. [June 1, 2009 Tr. 67:18–69:13.]

27. In coming on board to the Partnership's management, Wallace brought real estate development expertise to Perry Properties.[4] Wallace's expertise would allow the Partnership to generate equity capital and development fees. [June 5, 2009 Tr. 86:12–23.]

28. In 2005, Perry Properties established the W.C. Perry Properties Realty Fund, L.P., a Texas limited partnership (the Fund). Soon after its establishment, the Fund completed an offering in which it received capital commitments in excess of $3.5 million. The Fund was engaged in various aspects of real-estate business, and Perry Properties had investments in the Fund.[5]

### G. Dissension at, and Eventual Dissolution of, Perry Properties

29. Wallace had concerns regarding Perry's spending habits, which caused conflict within the Partnership. Perry frequently spent afternoons at the movies instead of working. [June 4, 2009 Tr. 168:2–8; 169:1–2.] Additionally, Perry made business deals without Wallace's or Bajjali's permission, and without the knowledge of investors. [June 5, 2009 Tr. 30:14–23.] Moreover, Perry stopped attending the Partnership meetings in approximately August of 2006. [June 4, 2009 Tr. 169:11–170:12; June 25, 2009 Tr. 64:17–65:1.]

30. Perry testified that Wallace's political activities became a liability to the Partnership. [June 1, 2009 Tr. 81:2–83:6.] Additionally, Perry testified that Bajjali,

---

4. Wallace joined Perry Properties as part of its management team, but he never became a partner in Perry Properties. The Court also notes that in various e-mails introduced into evidence, Wallace is referred to as a "partner." The Court finds that such a reference meant not that Wallace was a partner in the formal legal capacity as were Perry, Bajjali, and the Wallace Trusts, but rather that he was one of the individuals (along with Perry and Bajjali) responsible for running the operations of Perry Properties [Finding of Fact No. 11.]. Despite the fact that Wallace was not legally a partner of Perry Properties, there can be no doubt that Wallace was as interested in the financial well-being and success of Perry Properties as Perry and Bajjali were. This is so because the trusts of Wallace's two daughters were, together with Perry and Bajjali, the formal partners of Perry Properties pursuant to a written document (i.e., the Partnership Agreement). However, the trustee of the Wallace Trusts (i.e., McGrath, until his resignation) never was involved in the day-to-day operations of Perry Properties; rather, Wallace, Perry, and Bajjali were running the day-to-day operations.

5. For a lengthier discussion of the history of the Fund, see this Court's Memorandum Opinion Regarding Debtor's Objections to Proofs of Claim Number 38, 39, and 40. [Main Case, Docket No. 606]; *In re Perry*, 404 B.R. 196 (Bankr.S.D.Tex.2009). In the Fifth Circuit, collateral estoppel (i.e., issue preclusion) is generally applied when " '(i) the issue to be precluded [is] identical to that involved in the prior action, (ii) in the prior action the issue [was] actually litigated, and (iii) the determination of the issue in the prior action [was] necessary to the resulting judgment.' " *Berry v. Vollbracht (In re Vollbracht)*, 276 Fed.Appx. 360, 363 (5th Cir.2007) (quoting *In re Shuler*, 722 F.2d 1253, 1256 n. 2 (5th Cir.1984)). For purposes of this Memorandum Opinion, the Court adopts findings of fact numbers 2 and 11 from this Court's prior memorandum opinion in main case docket number 606. These particular findings of fact concern the history of the Fund.

Wallace, and he (i.e., Perry) were unable to effectively communicate with each other. [June 2, 2009 Tr. 302:4–24]. On August 24, 2006, Wallace suggested in an e-mail that the Partnership wind down. [June 4, 2009 Tr. 13:17–19]; [Pls.' Ex. No. 45.] Perry testified that until Wallace's August 24, 2006 e-mail suggesting that the Partnership wind down, Perry had been trying to make the Partnership work. [June 1, 2009 Tr. 244:9–23.] Wallace's e-mail led to Perry's desire to terminate the Partnership. [June 3, 2009 Tr. 214:20–215:6]; [Pls.' Ex. No. 45.]

31. Subsequently, Perry asserted that Bajjali left him a voice mail threatening him with bodily harm. He also asserted that Bajjali lurched at him in the office kitchen. The same week, Perry concluded that he needed a bodyguard to be present in the office. [June 1, 2009 Tr. 198:2–11.]

32. Patricia Glover (Glover), a former employee of Perry Properties, credibly testified that in her opinion, Perry had no reason to physically fear Bajjali. [June 2, 2009 Tr. 177:7–12.] The Court finds that Perry's testimony is not credible that: (a) Bajjali was physically threatening Perry; (b) Perry needed a bodyguard; and (c) Bajjali would actually harm Perry.

33. Further strain was put on the Partnership when Wallace—before informing his partners—announced that he would be running for a congressional seat in Congressional District Number 22. Wallace admitted that both Bajjali and Perry were concerned about the impact the election would have on the Partnership. Wallace subsequently asked Perry to speak with Perry's father, Bob Perry, about support-ing Wallace's campaign. [June 1, 2009 Tr. 75:5–76:9]; [June 19, 2009 Tr. 39:23–40:8; 40:20–41:21; 47:15–48:8.]

34. Lunsford, an investor in real-estate properties involving Perry Properties, testified that in January of 2007, Frishberg asked him to evaluate the solvency and status of Perry Properties because Frishberg was concerned about the Partnership's future. [June 3, 2009 Tr. 12:13–14:14.] Lunsford testified that on January 10, 2007, he had his first meeting to evaluate the Fund with Perry and Reagan Tielke (Tielke).[6] [June 3, 2009 Tr. 15:24–16:8.] Lunsford reported his findings to Frishberg and Albert Kaleta (Kaleta),[7] but not Perry, Bajjali, or Wallace. [June 3, 2009 Tr. 27:3–15.] Lunsford explored the option of removing the general partner—i.e., Perry—but determined it would be too expensive for the investors of the Fund. [June 3, 2009 Tr. 28:10–25.]

35. During the initial meeting with Lunsford, on January 10, 2007, Perry requested more money for the Fund. [June 3, 2009 Tr. 16:7–25.] Lunsford lacked confidence in Perry's abilities as a general partner because Lunsford rarely received satisfactory answers to his questions, saw no progress, and observed near foreclosure on all of the Partnership properties. [June 3, 2009 Tr. 29:1–23.] According to Lunsford, if there was ever a problem concerning a Partnership project, Perry always laid blame on Wallace and Bajjali. [June 3, 2009 Tr. 21:4–18.] Thereafter, in 2007, Perry was unable to raise additional funds from Frishberg and his investors for other funds run by Perry. [June 3, 2009 Tr. 22:18–23:1.]

---

**6.** Tielke is a former employee of Perry Properties. [June 2, 2009 Tr. 111:1–18.] After Wallace and Bajjali left Perry Properties, Tielke assumed the position of Chief Financial Officer of Perry Properties. [June 2, 2009 Tr. 113:11.]

**7.** Kaleta is a financial planner and analyst for Frishberg & Kaleta Capital Management. [June 2, 2009 Tr. 212:4–19.]

36. On September 9, 2006, Perry sent an e-mail to Hoffman, Perry's administrative assistant and confidant, cancelling all Partnership meetings. [June 4, 2009 Tr. 20:8–22:20]; [Pls.' Ex. No. 42.]

37. Because the tension and bitterness between Perry, on the one hand, and Wallace and Bajjali, on the other, reached an intolerable level, these three individuals decided that a parting of the ways needed to take place. Negotiations thereafter ensued and it was decided that Perry would purchase the Partnership interests of Bajjali and the Wallace Trusts.[8] Thereafter, the partners of the Partnership entered into the Purchase Agreement. The Purchase Agreement, dated November 15, 2006, outlined the obligations of Perry, the Wallace Trusts, and Bajjali in relation to the sale of the Partnership interests owned by the Wallace Trusts and Bajjali. [Pls.' Ex. No. 4.]

38. At trial, Perry admitted that the Purchase Agreement was a binding contract and carried with it many obligations. [June 4, 2009 Tr. 138:1–6.] Pursuant to the Purchase Agreement, Wallace and Bajjali relinquished their positions as managers of various entities that the Fund owned, [June 4, 2009 Tr. 89:22–90:5], all of which had a direct and important financial impact on Perry Properties.

39. Roger Arora (Arora),[9] an investor in the Fund, testified that he loaned $450,000.00 to Perry so that Perry could purchase all of the interests in the Part-

nership owned by Bajjali and the Wallace Trusts.[10] [June 2, 2009 Tr. 163:19–25.]

40. Perry recalled paying back Arora, in part, for the $450,000.00 he borrowed from Arora. Perry also admitted, however, that he did not entirely pay off the loan, but rather paid three installments of $10,000.00, all of which came from the Fund. [June 1, 2009 Tr. 191:13–192:20.] Arora testified that Perry has yet to repay the loan, except for the three installments of $10,000.00. [June 2, 2009 Tr. 164:4–15.]

41. Upon hearing of the demise of Perry Properties, Frishberg summoned both Wallace and Perry into his office in order to inform them that they needed to mend the Partnership because they had a duty to their investors. Perry, however, lost his temper, refused to attend the meeting, and made it clear he would not meet regarding the disintegration of Perry Properties. [June 3, 2009 Tr. 38:12–40:22; 41:1–20; 49:22–50:8.]

### H. Perry's Communications with Others

42. Tielke conceded at trial that Perry made less than flattering remarks about Wallace and Bajjali to Tielke. [June 2, 2009 Tr. 114:13–16.]

43. It was Tielke's understanding that Wallace and Bajjali had been paid in full. [June 2, 2009 Tr. 116:9–11.] The Court finds that aside from this testimony given by Tielke, Perry introduced no other evi-

---

8. Once again, Wallace himself was never a partner of Perry Properties. The trusts of his two children—the so-called Wallace Trusts—were, however, partners of Perry Properties, and Perry decided to purchase their interests in the Partnership.

9. Arora is in the wholesale clothing business and also is involved in real estate development. [June 2, 2009 Tr. 160:21–5; 162:3–4.]

10. The transcript reflects that in his testimony, Arora referred to Perry buying out "Costa

[Bajjali] and David's [Wallace's] share." In fact, Perry bought out the interests of Bajjali and the Wallace Trusts, not any interest of Wallace (who never held any Partnership interest). The reference to "David's share" is really a reference to the shares held by the Wallace Trusts (i.e., the trusts for Wallace's two daughters). Thus, a reference to "Wallace" is simply a short-hand reference to the Wallace Trusts.

dence suggesting that Perry had paid Wallace and Bajjali in full. The Court finds that Tielke's understanding was incorrect and that Wallace and Bajjali have not been paid in full by Perry.

44. Taseer Badar (Badar), an investment banker with substantial investments in projects of Perry Properties, was asked by Tielke to be a general partner; Badar declined. Badar has never spoken directly with Perry about Wallace. [June 2, 2009 Tr. 90:23–24; 99:21–100:12.]

45. James Grady Prestage (Prestage), a Fort Bend County Commissioner, had a phone conversation with Perry. In that phone conversation, Perry made the following threat: "Don't f——with me, I will destroy you like I did David Wallace."[11] [June 2, 2009 Tr. 130:17; 133:11–14.]

46. Frishberg and Kaleta, a financial planner and analyst for Frishberg and Kaleta Capital Management, were both heavily invested in Perry Properties. On numerous occasions, Perry told Kaleta that big changes were about to happen at Perry Properties. Kaleta was concerned about what those changes would be. [June 2, 2009 Tr. 212:6–7; 215:5–216:1.]

47. Perry believed Wallace and Bajjali were receiving kickbacks because Perry was lacking certain accounting records. Specifically, Perry asserted that there were no accounting records for the tenant improvement buildout. Perry communicated to a number of people—Dinesh Shah, Pritesh Shah (collectively, the Shahs),[12] Hoffman, Tielke, and Arora— that Wallace and Bajjali were receiving kickbacks. Perry equated these alleged kickbacks to stealing. Perry informed the Shahs through e-mail, but did not disclose in his testimony the form of communication used to inform Arora, Tielke, and Hoffman. [June 2, 2009 Tr. 59:22–24; 75:2–76:12; 291:18–292:19]; [June 4, 2009 Tr. 60:17–24.]

48. Lunsford inquired on January 10, 2007 as to why Wallace and Bajjali had departed from their business relationship with Perry. Perry responded by informing Lunsford that Wallace was performing his duties incompetently and stated that for the investors' sake, Perry had taken over. [June 3, 2009 Tr. 16:2–18:6.] Lunsford further testified that Perry frequently called Wallace incompetent and a dishonest businessman. [June 3, 2009 Tr. 18:19–19:3.]

49. Lunsford also testified that Perry asserted that funds improperly went to Bajjali. Lunsford believes Perry's assertions could be construed as an accusation of breach of fiduciary duty or fraud. [June 3, 2009 Tr. 19:4–20:24.]

50. In conversations with Frishberg, a substantial investor in projects of Perry Properties, Perry made comments to Frishberg about Wallace and Bajjali being crooks and incompetent. [June 3, 2009 Tr. 72:6–22.] Perry accused Wallace of forging Perry's name on a real estate commission check and told Frishberg that Wallace would end up in jail for the alleged forgery. [June 3, 2009 Tr. 44:3–11; 45:10–24.] Frishberg's investors did not want someone guilty of a crime, such as forgery, presenting them with investment opportunities. [June 3, 2009 Tr. 47:16–20.]

51. Perry informed Frishberg that, among other things, Wallace participated in selling weapons to Saudi Arabia, embezzled funds, and failed to pay a judgment to a bank. [June 3, 2009 Tr. 75:13–18.] Per-

---

11. The Court declines to repeat the aforementioned vulgar word in its entirety.

12. The Shahs are two brothers who were joint venturers with Perry Properties in a real estate investment. [June 3, 2009 Tr. 22:5–13.]

ry never told Frishberg, however, that Bajjali had committed any crime. [June 3, 2009 Tr. 75:23–76:1.]

52. Perry made negative comments about Wallace to Walters, a fellow member of the Sugar Land Rotary Club, during the 2006–2007 time period. [June 3, 2009 Tr. 96:2–20.] Perry never gave Walters any details or reasons as to why Perry was critical of Wallace. [June 3, 2009 Tr. 96:24–97:1.] Walters, along with others, received an e-mail from Perry advising the recipients not to associate with Wallace or Bajjali. [June 3, 2009 Tr. 98:14–21.]

53. McGrath, the former trustee of the Wallace Trusts and a businessman himself, received text messages containing statements from Perry that implied Wallace and Bajjali had committed fraud in regards to the Fund, but could not recall the details of the message because he did not take the text messages seriously. [June 3, 2009 Tr. 121:20–123:4.]

54. Thode, former Republican Party Chairman of Fort Bend County, Texas, had phone conversations with Perry regarding changes in relation to Perry Properties. [June 3, 2009 Tr. 136:15–23.] Additionally, Thode called Perry to set up a meeting between Perry and Gary Gillen (Gillen), the 2007 Fort Bend County Chairman of the Republican Party, but Perry stated he had no interest in meeting with him because Gillen was a friend of Wallace. According to Thode, Perry then stated—not in these precise words—that Wallace was a crook, had ripped Perry off, and had stolen property from Perry; and that anyone associated with Wallace was "not worth a dime." [June 3, 2009 Tr. 137:1–139:19.]

55. Keller, a real estate consultant, testified that in a business meeting with Perry, Perry stated that "David Wallace is a crook." [June 3, 2009 Tr. 153:2–154:1.]

56. Perry told other people that Wallace and Bajjali did not pay their bills on time. [June 4, 2009 Tr. 50:22–25.]

57. Perry sent Wallace and Bajjali unprofessional text messages during the pendency of his lawsuit against them. For example, Perry sent the following taunting text message to Wallace and Bajjali: "[c]an't pay your attorney's fees? Now this is getting fun. You guys tired yet? And will you ever learn you cant win?" [June 4, 2009 Tr. 56:18–57:3.]

*a. The "Trick" E-mail*

58. On September 24, 2006, Perry sent what he referred to as a "trick" e-mail. According to Perry, the purpose of this "trick" e-mail was to trap Bajjali, who Perry thought was secretly looking at his e-mails. The "trick" e-mail was an e-mail from Perry to Hoffman, Perry's administrative assistant and confidant. In the e-mail, Perry discusses his intent to leave Wallace and Bajjali with nothing. [June 1, 2009 Tr. 118:23–119:9.] The entire "trick" e-mail reads as follows: [13]

> I wanted to let you know that I am going filing bankruptcy per my attorneys advice. Please do not worry as this is part of my big plan I am going to be hatching this week. Dave [Wallace] and Costa [Bajjali] think they can pull the wool over my eyes they have no idea what is about to happen and I just love it. They [Wallace and Bajjali] will walk away with nothing after this week and oh Dave [Wallace] can kiss his political career goodbye. Costa [Bajjali] will be

13. The e-mails sent between various persons involved in this adversary proceeding contain misspelled words and grammatical errors. Rather than insert "[sic]" *ad nauseam,* the Court notes in this footnote that there are numerous grammatical and spelling errors in Perry's e-mails.

getting all the blame plus a hell of a lot of debt. The master is at work and I have them by there balls. Costa should have never sided with Dave.

[Pls.' Ex. No. 33.] According to Perry, he told Hoffman that he was sending this "trick" e-mail in order to catch Bajjali and Wallace intercepting his e-mails. [June 1, 2009 Tr. 119:15–23; 169:13–19.]

59. Bajjali did, in fact, have the back up tapes for all the Partnership's e-mails, but did not see the "trick" e-mail until late 2008. [June 1, 2009 Tr. 118:23–119:23; 169:13–19.] For his part, Wallace never saw Perry's "trick" e-mail prior to October 6, 2006, the date the Separation Agreement was signed. [June 5, 2009 Tr. 75:24–76:4.] The Court finds that Perry's testimony is not credible and that he did not purposely write and send the e-mail to Hoffman in order to "trick" Bajjali by catching him in the act of reading Perry's personal e-mails. Rather, the Court finds that Perry sent this particular e-mail to Hoffman because he was upset and angry and conveying his true thoughts to his close aide.[14]

### b. E-mails Involving Bob Perry, the father of Perry

60. Bob Perry does not send e-mails himself, but rather has Charlotte Flowers (Flowers), his assistant, receive and send e-mails on his behalf. [June 1, 2009 Tr. 92:10–93:10; June 5, 2009 Tr. 163:15–164:6.] He receives fifty or more e-mails a day, which Flowers places on his desk. He disposes of many e-mails because he does not have time to review them. [June 5, 2009 Tr. 176:23–178:7.]

61. Perry received many e-mails from Bob Perry and the substance of those e-mails usually centered around Perry's personal life. [June 1, 2009 Tr. 94:3–5.]

### c. E–Mails Regarding Wallace's Political Career

62. In response to an e-mail sent from Bajjali to Perry, Hoffman, who was Perry's administrative assistant and confidant, sent an e-mail to Perry stating the following:

> They [i.e., Wallace and Bajjali] treat you with no respect and like a child. They sluff you off ... They will NOT DO AS YOU ASK IN A TIMELY MANNER and it thoroughly pisses me off ... Will, I am sorry but this is the most belittling e-mail and I certainly would not stand for anyone to talk to me that way.

[Pls.' Ex. No. 36].

Perry testified that there is no relation between him distributing an online blog that negatively portrays Wallace and then four days later sending the "trick" e-mail to Hoffman stating that:

> I wanted to let you know that I am going filing bankruptcy per my attorneys advice. Please do not worry as this is part of my big plan I am going to be hatching this week. Dave [Wallace] and Costa [Bajjali] think they can pull the wool over my eyes they have no idea what is about to happen and I just love it. They [Wallace and Bajjali] will walk away with nothing after this week and oh Dave [Wallace] can kiss his political career goodbye. Costa [Bajjali] will be getting all the blame plus a hell of a lot of debt. The master is at work and I have them by

---

14. The "trick" e-mail is related to the Purchase Agreement insofar as this e-mail shows Perry's true intent: namely, to execute the Purchase Agreement and then do everything possible to ruin Bajjali's business career and reputation and to destroy Wallace's business career, political aspirations, and reputation.

there balls. Costa should have never sided with Dave.

[June 1, 2009 Tr. 224:7–17; June 2, 2009 Tr. 337:21–25.]; [Pls.' Ex. No. 33.]

63. In yet another e-mail, which this time Perry sent to Bajjali, Perry wrote the following:

FYI

I am pretty sure Dave will end up with the Shah's when he leaves here.

But on a possible buy out I will honor my word so you and I maybe work out some sort payment plan between us. Just thinking about this but this weekend look deep into the recent months of examples of Dave not being in line with us or as a team. Remember the front sit deal last year with Reagan and you. Also how about all these deals we ask him if he agrees with Kingwood, Challenger, Baytown to name a few then he backs out at the last minute. Trust me Dave has been looking to get out of this once my dad was not going to support him politically so weather it is now or six months from now Dave does not want to stay no matter what I say. It hurts his political future for the company owned by the son/Costa of the largest contributor does not support him really hurts him. Why do you think he did not get the write in? My dad gets what he wants in politics.

At the end of the day you and I will be much stronger once the storm is over and yes Dave has helped us build the company into what it is but don't forget the part you and I have done. You and I have become a great team and will continue in the future. Plus you know the development business.

Call me this weekend to discuss if you want.

[Pls.' Ex. No. 30.] Perry testified that he was "[b]eing an arrogant ass" when he wrote a portion of the aforementioned e-mail. Bob Perry described the e-mail as "ugly." [June 2, 2009 Tr. 312:20–313:21; June 5, 2009 Tr. 168:14–20.]

64. In another e-mail, which this time Perry sent to Hoffman, who was Perry's administrative assistant and confidant, Perry wrote that "the ball has started rolling now I cannot stop it about dave." Perry asserted that the statement was in reference to Wallace no longer wanting to be a part of the company. [June 2, 2009 Tr. 337:21–25]; [Pls.' Ex. No. 47.] This Court finds this explanation to lack credibility. Rather, this Court finds that in this e-mail, Perry intended to convey to Hoffman that he was prosecuting his plan to destroy Wallace's professional and political career.

65. McGrath received more than one, but no more than five, e-mails from Perry accusing Wallace of a crime, but could not recall specific details. [June 3, 2009 Tr. 116:2–117:15.] On January 1, 2007, Perry sent an e-mail to McGrath and informed him that Wallace and Bajjali had been involved in serious crimes. According to McGrath, Perry informed him that Perry had spoken with both the District Attorney and Sheriff of Fort Bend County. [June 2, 2009 Tr. 76:16–25; June 3, 2009 Tr. 119:4–120:8.] Indeed, Perry accused Wallace and Bajjali of trying to extort money, committing gross fraud, and committing serious crimes. [Pls.' Ex. No. 49.]

## I. Wallace's Political Background

66. Wallace testified that, as far as he knew, his announcement to run for Congressional District seat number 22 did not cause any problems within the Partnership or its businesses. [June 4, 2009 Tr. 174:16–24.] Perry complained to Hoffman, however, about Wallace running his campaign out of the Partnership's office. [June 1, 2009 Tr. 134:6–16.]

67. Perry asserted that Wallace pressured him—through e-mails—to discuss

Wallace's political aspirations with Bob Perry. [June 1, 2009 Tr. 94:23–96:8.] The Court finds that this assertion wholly lacks credibility because at trial, Perry never introduced into evidence any such e-mails from Wallace. The Court also finds that contrary to Perry's assertion, Wallace did not pressure Perry to discuss Wallace's political aspirations with Bob Perry.

68. Perry spoke to his father once about whom Bob Perry was going to support in the campaign for Congressional District seat number 22. [June 1, 2009 Tr. 94:23–96:8.]

69. Both Perry and his father contributed—in a limited capacity—to Wallace's mayoral campaign. [June 5, 2009 Tr. 26:15–16; June 19, 2009 Tr. 49:5–14.] Wallace failed to win the nomination of the Republican Party for this Congressional seat.

70. Bob Perry's limited funding for Wallace's political campaign did not affect Wallace's business relationship with either Perry or Bajjali. [June 5, 2009 Tr. 28:23–25.]

71. For the political campaign of Congressional District number 22, Bob Perry supported Shelly Sekula–Gibbs, Mrs. Perry's physician for twenty years. Wallace testified that while he was not upset by Bob Perry's lack of support, he would have appreciated it. [June 5, 2009 Tr. 159:9–18; June 19, 2009 Tr. 41:22–42:13.]

72. Perry told Kaleta that Wallace's career in politics was over, and that Perry was dissatisfied with the way Wallace and Bajjali were running the Partnership. [June 2, 2009 Tr. 221:20–222:21.]

## J. The Blog

73. Perry was unaware of who ran the Rhymes with Right blog (the Blog), an online blog that contained highly disparaging information—both politically and personally—about Wallace. [June 3, 2009 Tr. 186:5–12.] Perry did not provide the information concerning Wallace to the Blog and did not have anyone provide it on his behalf. [June 3, 2009 Tr. 191:5–21.] Additionally, Perry did not know whether the information on the Blog was true or false. [June 3, 2009 Tr. 194:19–195:6.]

74. Perry first saw the Blog in the summer of 2006. [June 3, 2009 Tr. 186:18–188:7.]

75. Although Perry did not provide the information concerning Wallace to the Blog, Perry circulated the Blog to several people. [June 3, 2009 Tr. 186:15–17.] For example, on September 21, 2006, Perry e-mailed Hoffman, requesting that she print out the Blog and give it to people on his behalf while he remained anonymous. [June 4, 2009 Tr. 38:23–39:19; 40:16–20; 48:1–7]; [Pls.' Ex. No. 37.]

76. On or around September 9, 2006, Perry's attorneys investigated the information provided in the Blog for evidence of misconduct by Wallace. [June 3, 2009 Tr. 223:1–23]; [June 4, 2009 Tr. 23:19–25:22.] The Blog insinuated, among other things, that Wallace was an arms dealer and was in league with Mark Thatcher in attempting to overthrow the government of Equatorial Guinea. [June 19, 2009 Tr. 37:11–21]; [Pls.' Ex. No. 21.] The Court finds that the Blog's insinuations regarding Wallace are false.

77. The allegations contained in the Blog are substantially false. Wallace testified that in his book, he attributed the Blog to Dean Hrbacek's associates and did not attribute it to either Perry or Bob Perry.[15] [June 5, 2009 Tr. 17:4–15]; [June

---

**15.** Wallace defeated Dean Hrbacek in the 2002 Sugar Land mayoral election. [June 19,

19, 2009 Tr. 16:2–17:2.] Nevertheless, the Court finds that Perry distributed the Blog.

### K. Harm to Wallace and Bajjali's Respective Careers

78. Before Perry filed for bankruptcy, he filed a state court fraud lawsuit against Wallace and Bajjali, accusing them of fraud. [June 2, 2009 Tr. 53:5–16.] The allegations contained in Perry's fraud lawsuit against Wallace did not affect Kaleta's investors in any way. [June 2, 2009 Tr. 254:20–23.] Kaleta is still involved and invested in a business run by Wallace and Bajjali. [June 2, 2009 Tr. 258:1–16.] Since 2007, Kaleta has placed $15.9 million of his investors' money with Wallace–Bajjali Investment Group (the Wallace–Bajjali Partnership).[16] [June 2, 2009 Tr. 260:12–15.] Nevertheless, Kaleta testified that he is now very guarded when conducting business with Wallace and Bajjali. [June 2, 2009 Tr. 261:8–13.]

79. Frishberg, who is a partner with Wallace and Bajjali in the Laffer Frishberg Wallace Fund,[17] testified that it was formed in approximately June of 2008 and it is a part owner of BizRadio. [June 3, 2009 Tr. 51:19–52:4.]

80. Perry sent a mass e-mail to various members of the Sugar Land Rotary Club, including Walters, advising them to avoid associating with Wallace and Bajjali. [June 3, 2009 Tr. 98:12–21.]

81. After McGrath received communications from Perry concerning Wallace, he extracted himself from all involvement with Wallace. [June 3, 2009 Tr. 129:24–131:1.] McGrath participated in multiple business transactions with Wallace prior to January 23, 2007, however, McGrath has not participated in any business transactions with Wallace since January 23, 2007. McGrath has subsequently resigned as trustee of the Wallace Trusts. [June 5, 2009 Tr. 24:22–35:8.]

82. After McGrath received the e-mail link to the Blog, Wallace came to believe McGrath's trust and confidence in him was gone. [June 5, 2009 Tr. 35:17–22.] Additionally, Wallace believes that his relationship with the Shahs deteriorated after they heard about allegations of Wallace receiving kickbacks and committing crimes. [June 5, 2009 Tr. 39:7–22.]

83. The Lincoln–Reagan Dinner is an annual fundraiser that the Fort Bend Republican Party puts on to raise money in order to fund campaigns. After Wallace made a contribution to the Lincoln–Reagan Dinner, the contribution was returned to him and he was asked to not introduce the guest speaker. [June 5, 2009 Tr. 47:11–22; 51:16–18.] Additionally, Wallace was asked not to speak at the Gathering of Men, a faith-based men's prayer group attended by approximately fifty to seventy men each month. [June 5, 2009 Tr. 66:25–69:15.] The Court finds that the accusations and allegations that Perry made against Wallace severely harmed his (i.e., Wallace's) political career, and that such harm is evidenced by, among other things, the return to Wallace of his contribution to the Lincoln–Reagan Dinner, the decision by the persons in charge of the Lincoln–

2009 Tr. 15:3–20.]

**16.** The Wallace–Bajjali Partnership was formed after Wallace and Bajjali left Perry Properties. Bajjali testified that he is currently employed by the Wallace–Bajjali Partnership. [June 25, 2009 Tr. 128:16–17.] The Wallace–Bajjali Partnership has also been re-ferred to as the Wallace–Bajjali Investment Group, but they are the same entity. [June 2, 2009 Tr. 260:12–15; 258:22–25.]

**17.** The Laffer Frishberg Wallace Fund is a private equity investment fund. [June 3, 2009 Tr. 51:19–20.]

Reagan Dinner not to ask Wallace to introduce the guest speaker as he had done in the prior four years, and the decision by the board of the Gathering of Men to withdraw its initial request that Wallace speak to this group. Finally, the accusations and allegations made by Perry against Wallace have had a negative impact not only on his political career, but also on his family life, including his relationship with both his wife and his two daughters. [June 5, 2009 Tr. 78:8–79:25.] Indeed, Wallace noted that all of the accusations that Perry made against him had diminished his ability to be a role model for his two daughters. [June 5, 2009 Tr. 79:23–25.]

L. Perry's Intent

84. Perry believes that he is obligated under both the Separation Agreement and the Purchase Agreement. When he entered into these agreements, he intended to honor them. [June 1, 2009 Tr. 176:8–180:21.]

85. In Perry's Chapter 11 bankruptcy case, it is his intention to honor the Purchase Agreement. If a plan were proposed on his behalf that does not honor the Purchase Agreement, he would want it changed.[18] [June 1, 2009 Tr. 256:3–260:18.] Indeed, Perry affirmatively stated—after repeatedly trying to deflect the questioning of Plaintiffs' counsel—that he will honor the damages stemming from his breach of the nondisparagement clause of the Purchase Agreement (the Nondisparagement Clause). [June 1, 2009 Tr. 274:24–276:15.]

86. Perry is not aware of any debt that he owes Wallace and Bajjali under the indemnification clause of the Purchase Agreement, i.e., Section 7.1 of the Pur-

chase Agreement (the Indemnification Clause). If Perry was aware of a debt, he asserts that he intends to pay it. [June 1, 2009 Tr. 256:3–257:1.]

87. Perry never gave any indication to Wallace that he would dishonor the Purchase Agreement. [June 5, 2009 Tr. 76:22–25.]

88. Perry admits that he breached paragraph 6.3 of the Purchase Agreement. [June 1, 2009 Tr. 271:6–275:2.] Moreover, Perry admits that he received notice that the Flagship Mezzanine loan (the Flagship Loan) was a nonperforming loan. [June 4, 2009 Tr. 103:1–12.]

89. The Imperial Property transaction was a real estate development deal which closed in July, 2007 (the Imperial Sugar Transaction). Perry never paid Bajjali a commission related to the Imperial Sugar Transaction. Bajjali's commission was supposed to amount to approximately thirty percent of the overall commission. Bajjali asked Perry for his commission percentage three times through e-mail. Bajjali received several text messages from Perry stating that Bajjali will not "see a dime." [June 1, 2009 Tr. 182:13–183:16]; [June 25, 2009 Tr. 63:3–23.] During continuous questioning by Plaintiffs' counsel referencing Perry's payment obligations to Bajjali and Wallace, Perry admitted that he had previously stated he was not going to pay Bajjali and Wallace a dime. [June 1, 2009 Tr. 59:8–60:14.]

90. Perry believed Wallace and Bajjali were extorting money from him. [June 1, 2009 Tr. 64:11–15; 66:10–12.] The Court finds that Perry's belief is unreasonable because he introduced no evidence relating to extortion.

---

**18.** As of the date of this Memorandum Opinion, Perry has not obtained confirmation of any plan. Perry has waited for resolution of this Adversary Proceeding, among others, before seeking to confirm a plan.

91. John Healey (Healey), Fort Bend County's District Attorney, had a conversation with Perry about potentially filing criminal charges against Wallace and Bajjali, but no case was ever brought to Healey. [June 2, 2009 Tr. 154:5–155:20.]

92. Milton Wright (Wright), the Fort Bend County Sheriff, had conversations with Perry regarding certain problems within the Partnership, and on at least one occasion, Perry presented documents for Wright to review. Wright could not determine whether any criminal violations had taken place. [June 2, 2009 Tr. 145:1–5; 146:16–147:7.]

93. Kaleta, a financial planner and analyst for Frishberg & Kaleta Capital Management (which had made investments in various projects involving Perry Properties), recalled that Perry complained to him that Wallace had committed fraud, and that Perry was threatening to file a fraud lawsuit. [June 2, 2009 Tr. 232:12–16.] Indeed, Perry informed Kaleta that he planned on serving Wallace with a lawsuit while he (i.e., Wallace) was in chambers at Sugar Land City Hall. This plan concerned Kaleta because he had many investors holding him accountable for investments in Perry Properties, and Kaleta did not want allegations of fraud to drag his firm into the dispute. [June 2, 2009 Tr. 216:18–219:8.]

94. Perry admitted that he filed a fraud lawsuit against Wallace and Bajjali in state court and that his only damages were attorneys' fees. [June 2, 2009 Tr. 298:4–15.]

95. Perry admitted he had no evidence to substantiate his claim that Wallace and Bajjali were receiving kickbacks. [June 2, 2009 Tr. 296:12–18.] The Court finds that contrary to Perry's assertions, Wallace and Bajjali never took any kickbacks.

96. Perry told Frishberg that he was not interested in reconciling with Wallace and Bajjali. [June 3, 2009 Tr. 49:22–50:8.]

97. Thode testified that Perry told him that he (i.e., Perry) was going to ruin Wallace's political career. [June 3, 2009 Tr. 139:20–140:7.]

M. Damages

98. Because of Perry's actions in relation to the Fund, Bajjali incurred damages. [June 25, 2009 Tr. 128:11–15.] These damages included the costs of restructuring the loans relating to the Fund's projects.[19] [June 25, 2009 Tr. 230:16–20.] Wallace and Bajjali met with every single lender in order to avoid foreclosure on all of the properties. [June 25, 2009 Tr. 230:16–232:3.]

99. The Imperial Sugar Transaction closed in July 2007, but Bajjali has not been paid his commission, even though he has repeatedly asked Perry for the money. [June 1, 2009 Tr. 182:13–183:16.]

100. The Wallace–Bajjali Partnership assumed the debts of the Fund approximately sixteen to eighteen months after the execution of the Purchase Agreement. [June 25, 2009 Tr. 128:16–129:19.] The Wallace–Bajjali Partnership then restructured the Fund debt using cash borrowed from investors. The total amount used to restructure the Fund debt was approximately $3.78 million. [June 25, 2009 Tr. 231:2–232:3.] Each creditor of the Fund filed a proof of claim in Perry's bankruptcy case. After the Wallace–Bajjali Partner-

---

19. Because Wallace himself was never partner in Perry Properties, Perry had no obligation under the Purchase Agreement to indemnify Wallace; rather, Perry's obligation was to indemnify Bajjali and the Wallace Trusts. [Pls.' Ex. No. 4] Accordingly, Perry's failure to indemnify, among other actions, results in damages to Bajjali, but not to Wallace personally.

ship restructured the debts owed by the Fund—mitigating damages—the creditors withdrew their proofs of claim.[20] [June 25, 2009 Tr. 240:6–249:10.] Meanwhile, Bajjali himself filed a proof of claim, which he later amended, against Perry's bankruptcy estate for the amount of $15,644,767.54. According to the amended proof of claim, this figure is calculated from, among other things, Perry's obligation to indemnify Bajjali for all liabilities arising from the personal guarantees executed by Bajjali in connection with the Partnership's operations. [Pls.' Ex. No. 56.] Under these circumstances, the Court finds that Bajjali incurred damages because Perry failed to honor the Indemnification Clause.

101. Wallace testified, and the Court finds, that the liquidated damages provision of the Purchase Agreement (i.e., Section 6.2) (the Liquidated Damages Clause) does not apply to loans or guarantees associated with the Fund; rather, the Liquidated Damages Clause only applies to the personal guarantees entered into by Bajjali or the Wallace Trusts that are in relation to borrowings made by the Partnership. [June 23, 2009 Tr. 61:16–62:1; 65:6–11]; [Pls.' Ex. No. 4, § 6.2.]

102. Bajjali, and the Wallace Trusts were personal guarantors of the Flagship Loan. [June 25, 2009 Tr. 112:1–4; 122:8–25; 37:20–22.] The Wallace–Bajjali Partnership paid off the Flagship Loan in full, paying $1.0 million [June 25, 2009 Tr. 240:17–241:3]; [Pls.' Ex. No. 16.][21] The Wallace–Bajjali Partnership paid $173,704.00 to avoid an indemnity claim for the Amegy Loan. [June 25, 2009 Tr. 241:14–242:4]; [Pls.' Ex. No. 16.]

103. Bajjali was a personal guarantor of the Morton Loans. [June 25, 2009 Tr. 112:13–16; 38:21–23.] The Wallace Trusts were not personal guarantors of the Morton Loans. [June 25, 2009 Tr. 123:8–15.] The Wallace–Bajjali Partnership paid down the balance of the Morton Loans by $76,915.00. [June 25, 2009 Tr. 199:24; 200:20; 245:15–246:7; 246:18–247:25.]

104. Bajjali and Wallace were personal guarantors of the Creekmont Loan. Perry was also a personal guarantor on the Creekmont Loan. The Wallace–Bajjali Partnership paid down the balance of the Creekmont Loan by $911,956.00. [June 25, 2009 Tr. 248:21–249:9]; [Pls.' Ex. No. 16.]

105. Bajjali and the Wallace Trusts were personal guarantors for the Bank of Texas Loans. [June 25, 2009 Tr. 116:3–20; 125:5–22.] Wallace was not a personal guarantor for the Bank of Texas Loans. [June 25, 2009 Tr. 116:3–20.] The Wallace–Bajjali Partnership paid down the balance of the Bank of Texas Loans by $417,773.00. [June 25, 2009 Tr. 242:5–244:5]; [Pls.' Ex. No. 16.]

106. Bajjali personally guaranteed the Cypress Loans. [Pls.' Ex. No. 56.] The Wallace–Bajjali Partnership restructured the Cypress Loans by paying $1,199,967.00 to Amegy Bank, in part covering cost overruns. [June 25, 2009 Tr. 231:19–232:3;

**20.** The following Fund debts were restructured by the Wallace–Bajjali Partnership: the Flagship Loan and the Amegy Bank loan (the Amegy Loan) (collectively, the Meadow Crest Loans), the Bank of Texas Riata West loan and Lakecrest loan (collectively, the Bank of Texas Loans), the Wachovia Bank Morton Crossing and Morton Ranch loans (collectively, the Morton Loans), the Frost Bank Creekmont loan (the Creekmont Loan), and the Amegy Bank Cypress Trails loans (the Cypress Loans).

**21.** The Meadow Crest Loans were paid by Meadow Crest Developers 226 Partnership (the Meadow Crest Partnership). [Def.'s Ex. Nos. 43, 44, 45 & 47.] The money that the Meadow Crest Partnership used, however, effectively came from the Wallace–Bajjali Partnership. [June 25, 2009 Tr. 196:19–197:12.]

201:1–14.] The total amount spent on restructuring the loans was $3,780,315.00. [June 25, 2009 Tr. 198:5–16]; [Pls.' Ex. No. 16.] Sections 7.1–7.3 of the Purchase Agreement—i.e., the Indemnification Clause—apply to any personal guarantees entered into by Bajjali and the Wallace Trusts that are made in relation to the operations of the Partnership and its affiliates, including the Fund. In contrast, the Liquidated Damages Clause does not include borrowings made by the Fund. [June 23, 2009 Tr. 65:16–25; 69:5–21]; [Pls.' Ex. No. 4 §§ 7.1–7.3.] The Liquidated Damages Clause states that Perry would owe liquidated damages in the event he failed to use his reasonable and best efforts to release Bajjali and the Wallace Trusts from all liability for any borrowings made by the Partnership by December 31, 2006. [Pls.' Ex. No. 4 § 6.2.]

107. The Plaintiffs' complaint fails to specifically plead lost profit damages.

## IV. CREDIBILITY OF WITNESSES

### A. *Will Clay Perry (the Debtor and Defendant)*

The Court gives little weight to the testimony of Perry. Perry attempted to convince the Court that he was credible and honest at the beginning of his testimony. [June 1, 2009 Tr. 51:12–53:4.] After this initial attempt to appear credible, however, Perry frequently had difficulty telling the truth, the whole truth, and nothing but the truth. [June 2, 2009 Tr. 62:15–25.] Perry's lack of credibility was obvious throughout his testimony. He often answered "I don't know" and "I don't remember" when asked questions by opposing counsel. [June 1, 2009 Tr. 54:16–22]; [June 1, 2009 Tr. 40:9–42:3.] Moreover, his testimony changed as need dictated. His answers were highly contradictory throughout the course of questioning. Perry's lack of credibility spanned almost every topic that counsel raised.

### 1. *Financial Responsibilities*

Perry's inability to take financial responsibility for himself and his business matters became evident throughout his testimony. He continuously refused to recognize his own financial problems. Additionally, when questioned on this topic, he was extremely reluctant to admit that his father had helped him financially. Indeed, his answers consistently varied on the subject. Perry admitted that his father paid the majority of his bills. When further questioned, however, Perry asserted that he paid his own bills. Perry was also unwilling to acknowledge his current woeful financial situation. [June 1, 2009 Tr. 41:21–42:3]; [June 4, 2009 Tr. 50:22–53:23.]

Further underscoring Perry's lack of credibility, he unequivocally testified that Perry Properties could pay its employees' salaries prior to Wallace joining the organization. [June 1, 2009 Tr. 72:12–23.] However, in an e-mail from Bajjali to Perry, Bajjali had stated the exact opposite: "Remember when we could not pay the bills or cover payroll for the employees. I had to take a second loan on my house to cover my monthly expenses as we could not make partners payroll regularly." [Pls.' Ex. No. 25.] Because this Court finds that Bajjali is a much more credible witness than Perry, Perry's testimony that Perry Properties could pay the salaries of its employees prior to Wallace joining the entity is not credible.

Perry also refused to answer opposing counsel's questions in a straightforward manner. His answers changed several times as to whether or not he paid Wallace and Bajjali under the Purchase Agreement. Indeed, it finally came to light during Perry's testimony that he paid Wallace and Bajjali using money from a third-party loan that he has yet to pay back. [June 4,

2009 Tr. 138:25–139:22.] This constant change in testimony underscores Perry's lack of credibility.

### 2. Wallace's Political Campaign

Perry testified that Wallace e-mailed him and pressured him to enlist Bob Perry's support for Wallace's Congressional campaign. Supposedly, these e-mails were part of the ultimate dissolution of the Partnership. Perry introduced none of these alleged e-mails into evidence, however, to support this allegation. [June 1, 2009 Tr. 76:7–78:17.]

Perry's contention that Wallace e-mailed Perry and asked Perry to persuade Bob Perry to support Wallace's election lacks credibility. In an adversarial proceeding, where both Plaintiffs' and Defendant's counsel entered an abundance of e-mails into evidence, Perry's inability to introduce one e-mail into evidence to support his assertions poses serious questions as to his ability to tell the truth. The Court finds Perry to be wholly lacking in credibility on this issue and finds that Wallace never pressured Perry to enlist Bob Perry's support for Wallace's congressional campaign.

### 3. The Purchase Agreement

Opposing counsel examined Perry about two major topics relating to the Purchase Agreement: the "trick" e-mail and the commission agreement between Bajjali and Perry.[22] Throughout all of Perry's testimony regarding these two topics, Perry's statements were inconsistent with his own previous testimony and both Plaintiffs' and Defendant's exhibits admitted into evidence.

### 4. The "Trick" E-mail

Perry seriously damaged his credibility when Plaintiffs' counsel questioned him about the "trick" e-mail. Perry wrote what he refers to as the "trick" e-mail on September 25, 2006 and sent it to Hoffman, his administrative assistant and confidant. [Finding of Fact No. 58.] He did so because he thought Bajjali was reading all of his (i.e., Perry's) e-mails. Perry contends that the purpose of the e-mail was to generate a reaction out of Bajjali and prove that Bajjali was reading Perry's e-mails. As this Court has already found, this Court does not find this contention at all credible.[23]

Perry failed to answer questions directly relating to the "trick" e-mail. He consistently answered "I don't know," and he was reluctant to give straightforward answers to any questions posed by counsel. [June 1, 2009 Tr. 156:1; 158:14; 160:13–16.] Further, he initially testified that he had given little thought to the e-mail when he drafted it. [June 1, 2009 Tr. 213:23–214:7.] Later, Perry stated that he thought about the "trick" e-mail for several hours. [June 1, 2009 Tr. 214:4–17.]

### 5. Commission Agreement Between Bajjali and Perry

As part of the Purchase Agreement, Perry promised to pay Bajjali a commission from the Imperial Sugar Transaction. [Def.'s Ex. No. 10.] Perry contradicted himself and showed a total lack of credibility throughout his testimony on this subject. Initially, Perry stated that he intended to pay Bajjali. Subsequently, he

---

**22.** The "trick" e-mail is reviewed in detail at Finding of Fact Nos. 58–59. The "trick" e-mail is related to the Purchase Agreement insofar as this e-mail shows Perry's true intent: namely, to execute the Purchase Agreement and then do everything possible to ruin

Bajjali's business career and reputation and to destroy Wallace's business career, political aspirations, and reputation.

**23.** See Finding of Fact Nos. 58–59

testified that he had the money but never paid Bajjali. Finally, Perry admitted he owed Arora—an investor in the Fund—money for the same commission that he owed Bajjali. [June 1, 2009 Tr. 184:2–13; 192:2–17.]

### 6. Specific Breaches of the Nondisparagement Clause of the Purchase Agreement

Perry testified about specific instances in which he breached the Nondisparagement Clause. When Plaintiffs' counsel questioned Perry regarding the Nondisparagement Clause, Perry had difficulty being consistent with his previous testimony. He consistently changed his testimony when a question was repeated to him by counsel. Thus, Perry lacked all credibility when questioned regarding breaches of the Nondisparagement Clause of the Purchase Agreement.

### 7. The Blog
#### a. Post Date of the Blog

Perry changed his testimony three times as to when he first saw the information posted on the Blog, an online blog that contained disparaging information—both politically and personally—about Wallace. Perry testified that he first saw the information posted on the Blog sometime in December of 2006. Subsequently, he testified that he first saw the information posted on the Blog in June or July of 2006. The first entry on the Blog, however, is dated August 15, 2006. When first questioned, Perry had no explanation as to how he saw the information prior to the post date. Subsequently, he claimed to have seen the information on a different website, which he could neither name nor provide evidence of its existence. [June 3, 2009 Tr. 186:18–187:19; 188:5–25; 192:4–9]; [June 4, 2009 Tr. 29:12–30:1.] Given Perry's conflicting testimony, the Court finds that he is not credible with respect to this topic.

#### b. Perry's Investigation of the Information on the Blog

Perry consistently contradicted himself when testifying about the Blog. Perry initially testified that he never received independent confirmation as to the truth of the allegations on the Blog. Later, Perry contradicted himself by stating that he independently researched some of the allegations. In particular, he stated that he read an article from The Guardian,[24] a newspaper that was hyperlinked in the Blog. He later contradicted himself by testifying that he did not read The Guardian article; instead, he claimed that he sent the information to his lawyers for them to investigate. Overall, his answers relating to when he conducted his investigation were both contradictory and, therefore, lacking in credibility. [June 3, 2009 Tr. 194:22–195:8; 204:15–205:6; 206:9–12; 208:16–209:17; 220:3–221:7.]

#### c. Anonymous Disbursement of the Blog

Perry distributed the Blog to many people. Specifically, Perry e-mailed the link to the Blog to his secretary, requesting that she anonymously distribute it to two people. When questioned, Perry changed his testimony several times and gave several explanations as to why he wanted his secretary to distribute the Blog anonymously. Most of Perry's answers were contradictory and were devoid of any credibility. [June 4, 2009 Tr. 40:12–25; 44:24–46:15.]

### 8. Accusations against Wallace and Bajjali

When questioned about e-mails that Perry sent stating that Wallace and Bajjali

---

**24.** The Guardian is a British daily newspaper based in London, England.

were unethical and corrupt, Perry did not want to admit that he sent these e-mails. He stated that he did not "recall an exact instance, but [he] wouldn't necessarily deny it." Perry's unwillingness to answer questions in a straightforward manner further underscores his lack of credibility. [June 4, 2009 Tr. 37:19–38:9.]

### a. E-mail to McGrath from Perry

Perry testified that he sent an e-mail to McGrath accusing Wallace and Bajjali of criminal acts. Perry stated he sent the e-mail prior to receiving confirmation from the District Attorney and the Sheriff regarding the truth of Perry's accusation. In contrast, Perry stated in a previous deposition that he had heard from both the District Attorney and the Sheriff before he sent the e-mail to McGrath. Perry was unwilling to acknowledge the contradictory statements from his deposition. [June 2, 2009 Tr. 41:17–44:23; 53:5–59:1.]

### b. E-mail to the Shahs from Perry

Perry testified that he sent an e-mail to the Shahs alleging that Wallace and Bajjali had received kickbacks. [Finding of Fact No. 47.] He later testified, however, that this e-mail was a lie. Subsequently, Perry stated that the e-mail was the truth, but he had no evidence to support his assertion. Again, Perry had difficulty distinguishing between truth and falsehood, and was unable to keep track of his prior statements. Perry altered his answers based on whether the answer was helpful to his case at that particular juncture in the trial. [June 2, 2009 Tr. 62:15–25; 63:13–18; 74:1–22.]

### B. Sylvia Hoffman

The Court gives little weight to Hoffman's testimony. Hoffman—Perry's assistant—attempted to appear credible throughout her testimony; however, she frequently responded with "I don't remember" when questioned regarding her relationship with Perry and interoffice interac-tions between partners and employees. Hoffman explained that Perry was her "bread and butter," and she consistently evaded questions when the answer might reflect poorly on Perry. While working for Perry, Hoffman received a large salary, and Perry paid many of her personal expenses. The day after leaving Perry Properties, Hoffman obtained a job at Wauson & Probus—the law firm representing Perry—due to Perry's influence. While Hoffman claimed that she does not like Perry, she still refused to bite the hand that fed her. [June 1, 2009 Tr. 101:16–22; 120:25–122:3; 135:10–136:18; 139:7–13; 140:13–21; 141:16–19.]

Hoffman was defensive when questioned regarding a number of topics. In particular, Hoffman was reluctant to admit that she read all of Perry's e-mails prior to printing and filing them. Though she attempted to appear credible, her priority was protecting her former employer, Perry. Overall, Hoffman's testimony lacked credibility and the Court gives little weight to her testimony.

### C. Fred Zeidman

The Court finds Zeidman's June 2, 2009 testimony to be credible. Zeidman, a former member of the Fund advisory board, answered questions in a forthright manner and to the best of his ability. He honestly admitted when he could not remember specific details of conversations and occurrences. He was not biased and he was not argumentative with counsel. [June 2, 2009 Tr. 83:5–88:12.] Therefore, the Court gives Zeidman's testimony substantial weight.

### D. Taseer Badar

Although Badar has a close relationship with Wallace, Badar—an investment banker with heavy investments in Perry Prop-

erties—honestly testified that his only conversations with Perry were superficial. [June 2, 2009 Tr. 88:24–105:11.] This Court finds Badar credible in his testimony and gives his testimony substantial weight.

### E. *Reagan Tielke*

Tielke originates residential mortgages for a mortgage company, though Tielke required clarification as to what he does for a living. Tielke's testimony reflected significant bias in favor of Perry. He was unable to remember facts and occurrences that he deemed to be unfavorable to Perry's defense. [June 2, 2009 Tr. 114:18–25.] This Court gives little weight to Tielke's testimony due to both his bias and his unwillingness to be forthright.

### F. *Kraig Killough*

Kraig Killough, a financial advisor and partner to Badar, was a credible witness. Although he continues to do business with Wallace, his answers reflected no bias. The Court gives substantial weight to his testimony.

### G. *James Prestage*

Prestage—a Fort Bend County Commissioner—was honest in his testimony and admitted that he gave little credence to Perry's political threats. In one specific instance, Perry made profane remarks toward Prestage because Prestage advised a company not to purchase a piece of property from Perry. [June 2, 2009 Tr. 132:15–133:16.] Despite this potential cause for bias, the Court found Prestage to be honest. He answered questions directly and in a forthright manner. Therefore, the Court finds Prestage's testimony credible and gives it substantial weight.

### H. *Jim Beamon*

Beamon was honest and straightforward in his testimony. The Court finds that Beamon is a credible witness and gives his testimony substantial weight.

### I. *Milton Wright*

Wright, the Fort Bend County Sheriff, was honest and straightforward in his testimony and this Court gives significant weight to his testimony.

### J. *Roger Arora*

Although Perry owes Arora—an investor in the Fund—a significant amount of money, Arora did not allow this potential bias to taint his testimony. The Court finds Arora's testimony credible and honest, and gives his testimony substantial weight.

### K. *Trish Glover*

Glover, a former employee of Perry Properties, was reluctant to testify, and she was fairly nervous on the stand. Yet, she was honest in answering the questions presented to her. The Court finds Glover a credible witness.

### L. *John Healey*

Healey, Fort Bend County's District Attorney, was honest and forthright in his answers. The Court finds Healey's testimony credible and gives it substantial weight.

### M. *Marshall Whichard*

Marshall Whichard (Whichard) is a private investigator in Fort Bend County. He has performed investigations for Perry on numerous occasions. Whichard was a credible witness and the Court gives significant weight to his testimony.

## N. *Richard Tisch*

There were contradictions in Richard Tisch's (Tisch) testimony regarding whether Tisch knew that Perry, Wallace, and Bajjali were partners and whether he knew that the Partnership had dissolved. [June 2, 2009 Tr. 188:15–189:12; 189:25–190:14; 191:4–7.]

Tisch, a friend of Perry, was protective of Perry while maintaining a semblance of loyalty to Wallace and Bajjali. He refused to expand and explain comments Perry had made to him regarding Wallace and Bajjali. While Tisch appeared honest in his testimony, he was very tight lipped and unwilling to freely disclose information. The Court does not give significant weight to his testimony.

## O. *Reggie Jacob*

Reggie Jacob (Jacob), a commercial real estate broker and a former employee of Perry Properties, was honest in his answers, though unable to remember specific details and to expand on conversations to which he was a party. The Court finds Jacob a credible witness, but cannot give significant weight to his testimony because his recollection was poor.

## P. *Albert Kaleta*

Kaleta, a financial planner and analyst for Frishberg & Kaleta Capital Management, was forthright and honest, even though he was disenchanted with Perry's failures as a businessman and the negative effect these failures have had on the clients whom Kaleta had persuaded to invest in Perry Properties. Overall, the Court finds Kaleta to be credible and gives substantial weight to his testimony.

## Q. *John Lunsford*

Lunsford, an investor involved in radio media, answered questions directly and honestly. He knows Perry, Wallace, and Bajjali, and did not show any bias toward any of them. The Court finds Lunsford to be credible and gives his testimony significant weight.

## R. *Daniel Frishberg*

While Frishberg—a former business associate of Perry and an investor—appeared credible and honest, the Court does not give Frishberg's testimony significant weight. Frishberg attempted to answer questions truthfully, but his answers were colored by his bias. Frishberg was very angry at Wallace, Bajjali, and Perry for the failure of the Partnership, and this bias was reflected in many of his responses. [June 3, 2009 Tr. 38:16–25; 40:9–41:11; 43:11–25; 83:15–22.] Given these circumstances, the Court gives some, but not significant, weight to his testimony.

## S. *Robert Walters*

The Court finds Walters, a member of the Sugar Land Rotary Club, to be credible and honest in every way. He was very straightforward in his responses and made every effort to tell the truth. The Court gives significant weight to Walters' testimony.

## T. *Meredith Iler*

The Court finds Iler—a member of both the Houston Rotary Club and an organizer of the Coalition to Salute America's Heroes—to be credible. Iler is somewhat biased, however, because Perry Homes is a major financial contributor to the Coalition to Salute America's Heroes. The Court gives some weight to her testimony.

## U. *Michael McGrath*

McGrath—owner of Asset Plus Corporation and a former member of the investment committee for Perry Properties—was extremely honest and direct when an-

swering questions posed by counsel. While he could have been biased due to his personal connection with Wallace and Wallace's family, he did not show any bias whatsoever and made every attempt to answer all questions honestly and to the best of his ability. The Court finds McGrath credible and gives his testimony significant weight.

### V. *Eric Thode*

Thode, a former Republican Party Chairman of Fort Bend County, knows both Perry and Wallace, but he did not appear biased toward either party. The Court gives substantial weight to Thode's testimony and finds him credible.

### W. *Bert Keller*

Keller testified regarding an e-mail that Perry sent him. In the e-mail, Perry told Keller that Keller was "not a good person." [June 3, 2009 Tr. 155:15156:11.] Although Perry attacked Keller's character and raised the possibility of bias in Keller's testimony, Keller remained neutral during the testimony. He answered questions truthfully and directly. The Court finds Keller's testimony to be credible and gives his testimony significant weight.

### X. *Bob Perry*

Bob Perry, Perry's father, answered questions honestly and directly throughout his testimony. [June 5, 2009 Tr. 158:2425.] When there were slight inconsistencies with a portion of his testimony, Bob Perry attempted to clarify the differences and explain them forthrightly. [June 5, 2009 Tr. 136:8–137:24; 160:20–161:5.] Not surprisingly, because Bob Perry is the father of Perry and no doubt loves his son, Bob Perry was hesitant to speak negatively of his son. Indeed, he quite justifiably tried to avoid admitting that his son could have lied. [June 5, 2009 Tr. 164:19165:5; 168:8169:11; 180:21–25; 182:13–25.] The Court does not view Bob Perry any less credible for this attitude. Any loving father would take the same approach. Overall, Bob Perry's testimony is very credible, and the Court gives significant weight to his testimony.

### Y. *David Wallace*

While Wallace was slightly guarded in some of his answers as the trial progressed, he did not evade questions posed to him; rather, he responded clearly. Indeed, even when he knew that answers to certain questions posed to him were not favorable to his position, Wallace answered honestly. This Court gives significant weight to Wallace's testimony and considers him to be a credible witness.

### Z. *Costa Bajjali*

Bajjali was very honest and credible throughout his testimony. He made every attempt to be direct and truthful when answering questions posed by counsel. While Bajjali had reason to be biased against Perry, he demonstrated through his testimony that he was not vindictive. The Court finds Bajjali to be very credible and gives significant weight to his testimony.

## V. CONCLUSIONS OF LAW

### A. *Jurisdiction and Venue*

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (I), (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir.1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v.*

*Ginther (In re Ginther Trusts )* Adv. No. 06–3556, 2006 WL 3805670, at *19 (Bankr. S.D.Tex. Dec.22, 2006) (holding that an "[a]dversary [p]roceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance"). Venue is proper pursuant to 28 U.S.C. § 1409.

### B. Claims Brought by Plaintiffs Pursuant to 11 U.S.C. § 523(a)(6)

#### 1. Breach of Contract Claims

■■■ A bankruptcy court must use applicable state law to decide the outcome of a breach of contract claim brought against the bankruptcy estate. *See IRS v. Luongo (In re Luongo )*, 259 F.3d 323, 331 (5th Cir.2001); *Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1119 (5th Cir.1995). Here, Texas state law applies, as the parties entered into the Purchase Agreement in Texas.[25] *Indus. Insulation Group, LLC v. Sproule*, 613 F.Supp.2d 844, 852 (S.D.Tex.2009) (holding that Pennsylvania law, rather than Texas law, should govern because, among other reasons, that is where the agreements were consummated).

##### a. Standing for Breach of Contract Claims

■■■ In Texas, to have standing to seek redress for a breach of contract, a plaintiff "must be personally aggrieved; his alleged injuries must be concrete and particularized, actual or imminent, not hypothetical. A plaintiff does not lack standing simply because he cannot prevail on the merits of his claim; he lacks standing because his claim of injury is too slight for a court to afford redress." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex.2008) (footnotes omitted). A court must determine standing when the suit is filed in the trial court. *In re Vogel*, 261 S.W.3d 917, 921 (Tex.App.-Houston [14th Dist.] 2008, pet. denied); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 n. 9 (Tex.1993). "Only the person whose primary legal right has been breached may seek redress for an injury." *Exxon Corp. v. Tyra*, 127 S.W.3d 12, 14 (Tex.App.-Tyler 2003, pet. denied) (quoting *Nobles v. Marcus*, 533 S.W.2d 923, 927 (Tex.1976)). If a legal right has not been breached, the plaintiff does not have standing. *Denman v. Citgo Pipeline Co.*, 123 S.W.3d 728, 732 (Tex.App.-Texarkana 2003, no. pet.). "Privity of contract provides a party with standing to maintain a suit on the contract." *Campbell v. Auto. Ins. Co. of Hartford Conn.*, No. 07–06–0158–CV, 2007 WL 1390625, at *2 (Tex. App.-Amarillo, May 9, 2007, no pet.) (citing *Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605, 618 (Tex.2004)).

##### i. Standing to Sue

■■ Bajjali is a signatory to the Purchase Agreement. The Purchase Agreement defines Bajjali, as well as the Wallace Trusts, as "Sellers." [Finding of Fact No. 4.] Bajjali has asserted injuries from Perry's breach of the Purchase Agreement. [Adv. Docket No. 1, ¶¶ 31–32.] Because Bajjali is named in the contract as a "Seller" and because Perry signed the contract, both Bajjali and Perry are in privity

---

**25.** Additionally, Section 9.5 of the Purchase Agreement (which is entitled "Governing Law and Venue") reflects the parties' intention to be bound by Texas law. [Pls.' Ex. No. 4, § 9.5.] "Under Texas law, where the parties to a contract dispute have agreed to an enforceable choice of law clause, the court must apply the law of the state upon which they agreed." *Int'l Interests, L.P. v. Hardy*, No. Civ.A. H–03–2418, 2004 WL 3998092, at *3 (S.D.Tex. Nov.17, 2004) (citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 678 (Tex. 1990)).

of contract. Thus, Bajjali has standing to sue Perry.

### ii. The Wallace Trusts Lack Standing to Sue

■ The Wallace Trusts are parties to the Purchase Agreement.[26] The Purchase Agreement defines the Wallace Trusts as "Sellers." [Finding of Fact No. 4.] Bajjali and the Wallace Trusts assert injuries from Perry's breach of the Purchase Agreement. [Adv. Docket No. 1, ¶¶ 31–32.] Because the Wallace Trusts are named in the contract as "Sellers," and because Perry signed the contract, they are in privity of contract.

Despite the fact that Perry and the Wallace Trusts are in privity of contract, the Wallace Trusts lack standing to sue. Administration of trusts in Texas is governed by the Texas Property Code. The Texas Property Code states that "[a]ny interested person may bring an action." TEX. PROP.CODE ANN. § 115.001(a). An interested person is defined as "a trustee, beneficiary, or any other person having an interest in or a claim against the trust or any person who is affected by the administration of the trust. Whether a person, excluding a trustee or named beneficiary, is an interested person may vary from time to time and must be determined according to the particular purposes of and matter involved in any proceeding" TEX. PROP. CODE ANN. § 111.004(7).[27]

■ The Texas Supreme Court has held that a trust itself may not sue or be sued directly. Ray Malooly Trust v. Juhl, 186 S.W.3d 568, 571 (Tex.2006). Indeed, a trust is not a legal entity, and "[c]ivil suits may be maintained only by or against parties having an actual or legal existence." Bailey v. Vanscot Concrete Co., 894 S.W.2d 757, 759 (Tex.1995); Ray Malooly Trust, 186 S.W.3d at 571. Moreover, a "trustee has the sole right and responsibility to enforce a cause of action in favor of a trust," which is only abrogated to a beneficiary when the trustee cannot or will not enforce the cause of action. Hamilton v. McLean, No. 03–99–00320–CV, 2000 WL 502828, at *3 (Tex.App.-Austin, April 27, 2000, no pet.). Here, neither the trustee of the Wallace Trusts nor a beneficiary of the Wallace Trusts sued on behalf of the Wallace Trusts. Instead, the Wallace Trusts, in their respective capacities as trusts, sued Perry. Based upon the authorities cited above, the Wallace Trusts do not have standing to sue for breach of the Purchase Agreement. Only the trustee of the Wallace Trusts has standing to bring such suit. Accordingly, the Wallace Trusts are barred from recovering any relief which they seek.

However, in case this Court is incorrect in its conclusion that the Wallace Trusts lack standing to sue, the Court will discuss the Wallace Trusts' causes of action infra. In so doing, the Court reaches the conclusion that the Wallace Trusts should not recover any of the relief which they seek.

### iii. Wallace Lacks Standing to Sue Under the Indemnification Clause

■ As noted above, under Texas law, a person must be in privity of contract in order to recover in any contract action. Interstate Contracting, 135 S.W.3d at 618 (citing Brown v. Todd, 53 S.W.3d 297, 305

---

26. McGrath, as the trustee of the Wallace Trusts, signed the Purchase Agreement. [Pls.' Ex. No. 4.]

27. A "business trust" is included within the definition of person. TEX. PROP.CODE ANN. § 111.004(10). For the purposes of this suit, however, it does not matter what type of trust the Wallace Trusts are, as the applicable law in Texas is that no trust, regardless of its nature, may sue or be sued directly.

(Tex.2001); *Republic Nat'l Bank of Dallas v. Nat'l Bankers Life Ins. Co.*, 427 S.W.2d 76, 79 (Tex.Civ.App.-Dallas 1968, writ ref'd n.r.e.)). An exception to the general rule requiring privity of contract, however, is the third-party beneficiary exception. *Republic Nat'l Bank*, 427 S.W.2d at 79 (citing 13 Tex. Jur.2d, Contracts, § 352, pp. 628–29; 17A C.J.S. Contracts § 519(1), p. 947, et seq.). To qualify as a third party beneficiary under Texas law: (1) Wallace must not have been in privity of contract; (2) the contract (here, the Purchase Agreement) must have been made-at least in part-for Wallace's benefit; and (3) the contracting parties must have intended in the written agreement to benefit Wallace. *IP Petroleum Co. v. Wevanco Energy, L.L.C.*, 116 S.W.3d 888, 898–99 (Tex.App.-Houston [1st Dist.] 2003, pet. denied); *Hellenic Inv., Inc. v. Kroger Co.*, 766 S.W.2d 861, 864 (Tex.App.-Houston [1st Dist.] 1989, no writ).

Wallace does not have standing to sue under the Indemnification Clause. At trial, Defendant's counsel adduced testimony from Wallace that he was neither listed as a "Seller" on the Purchase Agreement nor had a personal guaranty from Perry at the time he filed his proof of claim. [Finding of Fact No. 4] Wallace was not a party to the Purchase Agreement, nor did he sign as trustee of the Wallace Trusts. [Pls.' Ex. No. 4, pp. 8–10.] Therefore, Wallace was not in privity of contract under the Purchase Agreement's indemnification provision. The first element for Wallace qualifying as a third-party beneficiary is satisfied.

Wallace also satisfies the second element because he stands to benefit from the agreement by being indemnified. [Def.'s Ex. Nos. 39, 50 & 52.] Wallace personally guaranteed a number of loans for which the Wallace–Bajjali Partnership was forced to expend funds in order to restructure the personally guaranteed loans. [Finding of Fact Nos. 98–106.] As such, if Wallace was a party to the Indemnification Clause, Perry would have to indemnify Wallace and compensate him for funds expended in restructuring the loans.

 Wallace, however, fails to satisfy the third requirement. No evidence was produced indicating that the contracting parties intended for Wallace to benefit from the indemnification provision. Texas law states that "when parties have executed a written contract, then the search for the parties' intent regarding a third-party beneficiary is limited to the four corners of the written instrument." *Talman Home Fed. Sav. & Loan Ass'n of Ill. v. Am. Bankers Ins.*, 924 F.2d 1347, 1352 (5th Cir.1991) (quoting *Cunningham v. Healthco, Inc.* 824 F.2d 1448, 1458 (5th Cir.1987)) (internal quotation marks omitted). Moreover, "The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied." *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex.1998). The language within the four corners of the Purchase Agreement does not indicate an intent to indemnify Wallace. While Bajjali and the Wallace Trusts are specifically referred to as "Sellers," Wallace individually is not mentioned. [Pls.' Ex. No. 4.] The Purchase Agreement only mentions Wallace individually in section 6.5, which notes that the car provided to Wallace "may be used by the Sellers after closing." [Pls.' Ex. No. 4, § 6.5.]

Even looking outside the language of the Purchase Agreement, evidence suggests that the parties did not intend for Wallace to be included as a third-party beneficiary. When examined, Wallace answered, "That's correct" to the question "[y]ou personally and individually were not a party to the Purchase Agreement; correct?"

[June 23, 2009 Tr. 51:4–6.] Therefore, Wallace's own testimony indicates that he did not contemplate that he was a party to the Purchase Agreement or that he ever contemplated benefiting from it. For these reasons, Wallace has no standing to sue under the Indemnification Clause.

### iv. Wallace Lacks Standing to Sue Under the Nondisparagement Clause

■ The Purchase Agreement contemplates extension of the Nondisparagement Clause to affiliates of the Sellers, [Pls.' Ex. No. 4, § 7.1], and there is no question that the Wallace Trusts are indicated as Sellers in the Purchase Agreement. [Finding of Fact No. 2]; [Pls.' Ex. No. 4, p. 1, ¶ 5.] Wallace has no standing to sue under the Nondisparagement Clause of the Purchase Agreement, however, because he is not an affiliate of the Wallace Trusts.

An affiliate, as defined by Texas trust law, is "(A) a person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with another person; or (B) any officer, director, partner, employee, or relative of a person, and any corporation or partnership of which a person is an officer, director, or partner." TEX. PROP.CODE ANN. § 111.004(1).

The Texas Property Code defines "Person" as:

(A) an individual; (B); a corporation; (C); a limited liability company; (D) a partnership; (E) a joint venture; (F) an association; (G) a joint-stock company; (H) a business trust; (I) an unincorporated organization; (J) two or more persons having a joint or common interest, including an individual or a corporation acting as a person representative or in any other fiduciary capacity; (K) a government; (L) a governmental subdivision, agency, or instrumentality; (M) a public corporation; or (N) any other legal or commercial entity.

TEX. PROP.CODE. ANN. § 111.004(10).

Here, Wallace is the father of the two beneficiaries of the Wallace Trusts. [Finding of Fact No. 2.] The Texas Property Code, however, does not include the beneficiary of a trust under the definition of a "person." TEX. PROP.CODE. ANN. § 111.004(10). Thus, under section (A) of § 111.004(1), Wallace is not an affiliate because he cannot control, be controlled by, or be under common control with the Wallace Trusts. Moreover, under section (B) of § 111.004(1), to qualify as an affiliate of the Wallace Trusts, Wallace would have to be the father of the Wallace Trusts themselves, not the beneficiaries, which is an impossibility. Accordingly, Wallace is not an affiliate of the Wallace Trusts; thus, he does not have standing to sue under the Nondisparagement Clause.

### b. Breach of Contract Under Texas Law

First, Bajjali and the Wallace Trusts allege that Perry breached the Indemnification Clause. [Pls.' Ex. No. 4 §§ 7.1–7.3]; [Adv. Docket No. 1, ¶ 31.] The Plaintiffs allege that Perry owes them funds that the Wallace–Bajjali Partnership used to avoid indemnity claims. [Pls.' Ex. No. 16.]

Second, Wallace and Bajjali allege that Perry breached the Nondisparagement Clause [Pls.' Ex. No. 4, § 6.3.] Specifically, Wallace and Bajjali assert that Perry breached this clause by making defamatory remarks about them to members of the business community.

■ Texas courts have held that in order to establish a claim for breach of contract, a plaintiff must satisfy four elements: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result

of the breach." *Valero Mktg. & Supply Co. v. Kalama, Int'l,* 51 S.W.3d 345, 351 (Tex.App.-Houston [1st Dist.] 2001, no pet.) (citing *Hussong v. Schwan's Sales Enters.,* 896 S.W.2d 320, 326 (Tex.App.-Houston [1st Dist.] 1995, no writ)) (emphasis omitted). The plaintiff must show by a preponderance of the evidence that the breach of contract was the proximate cause of any damages suffered. *Griffin v. Eakin,* 656 S.W.2d 187, 189 n. 1 (Tex.App.-Austin 1983, writ ref'd n.r.e.).

### i. A Valid Contract Exists

Here, Perry testified that he understood that the Purchase Agreement was a binding document and carried with it many obligations.[28] [Finding of Fact No. 38.] Therefore, this Court concludes that a valid contract exists. Accordingly, the first element needed to establish a claim for breach of contract is met.

### ii. The Plaintiffs Performed Under the Contract

To establish performance, a plaintiff must prove that he tendered or executed his duties under the contract. *See Coastal Mart, Inc. v. Sw. Bell Tel. Co.,* 154 S.W.3d 839, 847 (Tex.App.-Corpus Christi 2005, pet. granted, judgm't vacated w.r.m.) (citing *Ford v. City State Bank of Palacios,* 44 S.W.3d 121, 137 (Tex.App.-Corpus Christi 2001, no pet.)). Under the Purchase Agreement, the Plaintiffs were to relinquish their interest in the entities, with Perry assuming control. Wallace and Bajjali resigned their respective positions and transferred all of their interests in accordance with the Purchase Agreement. [Finding of Fact No. 38.] Therefore, the Plaintiffs have performed their obligations under the Purchase Agreement, thus establishing the second element for a valid breach of contract action.[29]

### iii. Perry Breached Multiple Provisions of the Purchase Agreement

The Plaintiffs assert that Perry breached the duties and obligations of both the Nondisparagement Clause and the Indemnification Clause. A defendant breaches a contract by failing to execute, tender, or perform on a contractual duty. *See Coastal Mart, Inc.,* 154 S.W.3d at 847.

#### (A) Breach of the Nondisparagement Clause (Section 6.3 of the Purchase Agreement).

The Nondisparagement Clause reads as follows:

> On and after the closing, Perry and his affiliates and each of the Sellers and their affiliates will refrain (and will use their reasonable efforts to cause their family members to refrain) from making disparaging, negative or similar remarks concerning each other to any third-party intended to cause harm to the other's business or business reputation, except to the extent that any party (a) is required to make such remarks by applicable law or regulation or judicial or regulatory process or (b) makes such remarks in or in connection with any pending litigation or other proceeding.

---

**28.** In the suit at bar, Perry does not deny the validity and enforceability of the Purchase Agreement. [Finding of Fact No. 38.] Indeed, Perry testified to having signed the Purchase Agreement, knowing that he was bound by it. [Finding of Fact No. 38.] Therefore, an analysis of the validity of the Purchase Agreement is unnecessary, thus satisfying the first element of a breach of contract cause of action.

**29.** The Wallace Trusts also performed under the Purchase Agreement when the trustee of the Wallace Trusts executed the documents required to be executed under the Purchase Agreement. Therefore, the Court also concludes that the Wallace Trusts have performed their obligations under the Purchase Agreement.

[Pls.' Ex. No. 4, § 6.3.] Perry admitted to breaching this clause on several occasions. [Finding of Fact No. 88.] Perry also admitted to owing damages as a result of the breach. [Finding of Fact No. 85.] Specifically, in reference to the Nondisparagement Clause, Perry testified:

Q: Okay. So you don't contest that not only did you breach the contract, but you're even liable for the damages that flow from the breach of this contract, right?

A: Yes. There's [sic] consequences for my actions, yes.

[June 1, 2009 Tr. 274:14–275:2.]

In addition to Perry's admission, the evidence presented at trial independently shows that he made disparaging remarks about Wallace and Bajjali. For example, McGrath received numerous text messages from Perry accusing Wallace and Bajjali of committing fraud. [Finding of Fact No. 53.] For all of these reasons, Perry breached the Nondisparagement Clause in relation to Bajjali.[30]

(B) Breach of the Indemnification Clause (Section 7.1–7.3 of the Purchase Agreement)

The Plaintiffs assert that Perry breached the Indemnification Clause by failing to indemnify them for the following obligations: (1) liabilities and attorneys' fees relating to the Meadowcrest Loans; (2) principal and interest accrued from the Bank of Texas Loans; (3) principal and interest accrued from the Morton Loans; (4) the One Sugar Lakes Lease;[31] (5) the Creekmont Loan; and (6) the Cypress Loans.

Section 7 of the Purchase Agreement sets forth the following:

*7.1 Personal Guarantees.* Perry hereby agrees to indemnify, defend and hold harmless the Sellers from all liabilities, obligations, indebtedness and claims arising from the personal guarantees made by the Sellers prior to the closing in connection with the operations of the Partnership and its affiliates, including W.C. Perry Properties Investments, LLC and W.C. Perry Properties Realty Fund, LP. Each of the Sellers hereby agree to indemnify, defend and hold harmless Perry from all liabilities, obligations, indebtedness and claims arising from the personal guarantees made by Perry, if any, in connection with the operations of WBIF and its affiliates.

*7.2 Partnership Agreement and Regulations.* Perry agrees to indemnify, defend and hold harmless the Sellers from all liabilities, obligations, indebtedness and claims arising under the Partnership Agreement and the Regulations unless caused by the gross negligence or willful misconduct of the Sellers.

*7.3 Notice.* In the event of an occurrence that would give rise to any party becoming entitled to indemnification under this *Paragraph 7*, the indemnified party will give the indemnifying party notice thereof, including a full summary of the relevant details.

[Pls.' Ex. No. 4, §§ 7.1–7.3.]

Indemnification is necessary when a indemnitor promises to protect or hold a

---

30. No evidence was presented showing that Perry breached the Nondisparagement Clause in relation to the Wallace Trusts; thus, this Court concludes that Perry did not breach the Nondisparagement Clause relating to the Wallace Trusts

31. The issue of whether any claims against Wallace and Bajjali relating to the One Sugar Lakes Lease should be allowed or disallowed as indemnification claims against Perry will be adjudicated in the adversary proceeding styled *Perry et al. v. One Sugar Lakes Professional Centre Partners, L.P.* [Adv. No. 08–03465, Docket No. 26.]

party harmless against existing and future loss, liability, or both. *Wallerstein v. Spirt*, 8 S.W.3d 774, 779 (Tex.App.-Austin 1999, no pet.). Here, indemnity is due because under the Purchase Agreement, Perry indemnified Bajjali and the Wallace Trusts against liability, and indemnification against liability accrues when the liability has been incurred and is certain. *See Holland v. Fid. & Deposit Co. of Md.*, 623 S.W.2d 469, 470 (Tex.App.-Corpus Christi 1981, no writ) (holding an indemnitor bound when the liability is both fixed and certain); *Mullins v. Elieson*, 611 S.W.2d 921, 925 (Tex.Civ.App.-Amarillo 1981, no writ) (holding that if a liability is indemnified, the obligation is due when the liability is incurred). Each of the liabilities for which Bajjali and the Wallace Trusts seek indemnification arose out of activity that occurred prior to November 15, 2006, the effective date of the Purchase Agreement.[32] [Pls.' Ex. No. 4.]

### (i) Breach of the Indemnification Clause relating to Bajjali

A reasonable reading of section 7.1 provides that Perry agreed to indemnify Bajjali and the Wallace Trusts from any liabilities that arose from their personal guarantees of loans made prior to November 15, 2006, the effective date of the Purchase Agreement. [Pls.' Ex. No. 4.] Indeed, Perry himself testified that, although he is not aware of any liabilities of Bajjali and the Wallace Trusts at this time for which he needs to indemnify them, he conceded that if such liabilities exist, he would need to indemnify them. [Finding of Fact No. 86.] At trial, Bajjali testified that he had personally guaranteed the Flagship Loan, the Amegy Loan, the Morton Loans, the Creekmont Loan, the bank

of Texas Loans, and the Cypress Loans. [Finding of Fact Nos. 102–106.] Accordingly, this Court concludes that Perry agreed to indemnify Bajjali and that the loans.

The Purchase Agreement requires Bajjali and the Wallace Trusts to give Perry notice of the need for indemnification. [Pls.' Ex. No. 4, § 7.3.] Actual notice has been defined as:

> [E]xpress or positive personal information or knowledge directly communicated to the person to be affected. In a more comprehensive sense, the term also embraces knowledge of all those facts which reasonable inquiry would have disclosed, the duty of inquiry extending only to matters that are fairly suggested by the facts really known. In other words, whatever fairly puts a person upon inquiry is actual notice of the facts that would have been discovered by reasonable use of the means at hand.

*Flack v. First Nat'l Bank of Dalhart*, 148 Tex. 495, 226 S.W.2d 628, 631–32 (1950) (citing 31 Tex. Jur. Sec. 3, pp. 359–60); *see also Dean's Campin' Co. v. Hardsteen*, No. 01–00–01190–CV, 2002 WL 1980840, at *3 n. 3 (Tex.App.-Houston [1st Dist.] Aug. 29, 2002, pet. denied) (finding that an indemnifying party received notice of indemnification by nature of being a co-defendant in the suit).

■ Bajjali filed a proof of claim, which was then amended, against Perry's bankruptcy estate asserting indemnification for all of the liabilities previously discussed. [Finding of Fact No. 100]; [Pls.' Ex. No. 56.] The proof of claim qualifies as sufficient notice in satisfaction of section

---

**32.** Wallace himself was not a partner and therefore not a party to the Purchase Agreement. [Finding of Fact No. 2.] Because the Indemnification Clause is incorporated into the Purchase Agreement, the Indemnification Clause, and the rights that flow therefrom, applies only to those Plaintiffs who signed the Purchase Agreement, i.e., Bajjali and the Wallace Trusts. Wallace is therefore not entitled to invoke the Indemnification Clause.

7.3 of the Purchase Agreement because it directly communicated to Perry the necessary information. *See Flack*, 226 S.W.2d at 631–32. Additionally, Perry admitted that he knew the Flagship Loan—one of the Meadowcrest Loans—was a nonperforming loan. [Finding of Fact No. 88.] Perry is also a plaintiff in a lawsuit against Bajjali relating to the One Sugar Lakes Lease, in which Wallace and Bajjali are asking for the amount due to them in a counterclaim. *Perry v. One Sugar Lakes Prof'l Ctr. Partners, LP*, No. 08–03465 (Bankr S.D. Tex. Jan. 3, 2008). This counterclaim also qualifies as notice to Perry in satisfaction of section 7.3 of the Purchase Agreement.

Aside from these circumstances, Bajjali credibly testified that: (1) he was a personal guarantor on all of the loans; (2) he provided Perry notice regarding his entitlement to indemnification; and (3) Perry failed to indemnify him for the losses accrued to restructure the loans. [Finding of Fact Nos. 102–106.] Thus, Perry breached the Indemnification Clause as to Bajjali.

Based on the testimony and evidence presented at trial, this Court concludes that: (1) Perry agreed to indemnify Bajjali from any liabilities that arose from his personal guaranties of loans made by the Partnership and its affiliates prior to the effective date of the Partnership Agreement; and (2) Perry has breached the Indemnification Clause as to Bajjali.

(ii) Breach of the Indemnification Clause relating to the Wallace Trusts

Perry breached the Indemnification Clause in relation to the Wallace Trusts because Perry failed to indemnify the Wallace Trusts from the Bank of Texas Loans, and the Flagship Loan, one of the Meadowcrest Loans. The Purchase Agreement only indemnifies the Wallace Trusts from "personal guarantees." [Pls.' Ex.

No. 4, § 7.1.] Because the Wallace Trusts were personal guarantors only on the Flagship Loan and the Bank of Texas Loans, Perry's obligation to the Wallace Trusts is limited to those specific loans. Moreover, the filing of a proof of claim against Perry's bankruptcy estate requesting indemnification satisfies the notice requirement of section 7.3 of the Purchase Agreement. *Flack*, 226 S.W.2d at 631–32. Therefore, Perry has breached the Indemnification Clause in relation to the Wallace Trusts because: (1) Perry owes an obligation to indemnify the Wallace Trusts; (2) the Wallace Trusts provided sufficient notice for indemnification; and (3) Perry has failed to indemnify the Wallace Trusts.

*c. Damages*

In a contract cause of action, damages may be broken into one of two categories: actual or consequential. The Texas Supreme Court has held that "[i]n an action for breach of contract, actual damages may be recovered when the loss is the natural, probable, and foreseeable consequence of the defendant's conduct." *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex.1981). Indeed, these damages are "intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (quoting *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001)).

Consequential damages are damages that occur naturally, but do not necessarily stem from the breach. *See Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex.1995) (quoting *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 163 (Tex.1992)), *overruled on other grounds, Ford Motor Co. v. Ledesma*, 242

S.W.3d 32, 45 (Tex.2007). Moreover, consequential damages are not recoverable unless the damages were foreseeable. *U.S. ex rel. CMC Steel Fabricators, Inc. v. Harrop Constr. Co.,* 131 F.Supp.2d 882, 890 (S.D.Tex.2000); *see also Mead,* 615 S.W.2d at 687. Accordingly, in order to recover consequential damages, the damages must have been foreseeable by the parties, directly traced to the breach, and result from the breach. *See Mead,* 615 S.W.2d at 687. Thus, the parties must reasonably appreciate that "misdeeds [could] arise to the magnitude of destruction" so claimed, and if they cannot be reasonably thought of at the time the contract was made, consequential damages are inappropriate. *CMC Steel,* 131 F.Supp.2d at 892.

 Bajjali and the Wallace Trusts are also eligible to recover attorneys' fees. "A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001. The Plaintiffs must prevail on their breach of contract claim and recover damages in order to recover attorneys' fees. *Green Int'l v. Solis,* 951 S.W.2d 384, 390 (Tex.1997) (citing *State Farm Life Ins. v. Beaston,* 907 S.W.2d 430, 437 (Tex.1995)).

### i. Bajjali's Damage

### (A) Nondisparagement Clause Damages (Actual Damages)

Perry breached the Nondisparagement Clause only relating to Bajjali. Bajjali, however, failed to provide evidence of any losses or consequential damages suffered because of the disparagement. The testimony and evidence fails to satisfy, by a preponderance of the evidence, that Perry's disparaging remarks caused harm to Bajjali's business or business reputation. Therefore, Bajjali may not recover under this claim because he has fallen short of satisfying his burden of proof for damages.

### (B) Indemnification Damages (Actual Damages)

 Bajjali has suffered injury from Perry's breach because Bajjali was a personal guarantor on the loans for which he seeks indemnification. [Finding of Fact Nos. 102106.] "The mitigation of damages doctrine is an affirmative defense that requires an injured party, following a breach, to exercise reasonable care to minimize his damages if it can be done with slight expense and reasonable effort." *Allen v. Am. Gen. Fin., Inc.,* 251 S.W.3d 676, 686 (Tex.App.-San Antonio 2007, pet. granted) (citing *Great Am. Ins. Co. v. N. Austin. Mun. Util. Dist. No. 1,* 908 S.W.2d 415, 426 (Tex.1995)). This Court concludes that the restructuring of the loans that Bajjali guaranteed constitutes proper mitigation of damages by Bajjali. At trial, Bajjali testified that the Wallace–Bajjali Partnership borrowed $3.78 million from investors in order to restructure loans that he personally guaranteed. [Finding of Fact Nos. 102–106.] Therefore, because Bajjali—through the Wallace–Bajjali Partnership's successful restructuring of the various guaranteed obligations—successfully mitigated damages, Perry is liable to Bajjali for the cost of the restructuring of the loans.

The cost of restructuring the loans is calculated as follows: (1) With respect to the Flagship Loan, the Wallace–Bajjali Partnership paid off this loan by making a payment of $1,000,000.00 [Finding of Fact No. 102.] Therefore, the cost here is $ 1,000,000.00. (2) With respect to the Amegy Loan, the Wallace–Bajjali Partnership paid $173,704.00 to avoid an indemnity claim from Amegy Bank. [Finding of Fact No. 102.] Therefore, the cost here is

$173,704.00. (3) With respect to the Morton Loans, the Wallace–Bajjali Partnership paid down the balance of these obligations by $76,915.00. [Finding of Fact No. 103.] Therefore, the cost here is $76,915.00. (4) With respect to the Creekmont Loan, the Wallace–Bajjali Partnership paid down the balance of this obligation by $911,956.00. [Finding of Fact No. 104.] Therefore, the cost here is $911,956.00. (5) With respect to the Bank of Texas Loans, the Wallace–Bajjali partnership paid down the balance of these obligations by $417,773.00. [Finding of Fact No. 105.] Therefore, the cost here is $417,773.00. (6) With respect to the Cypress Loans, the Wallace–Bajjali partnership paid $1,199,967.00 to Amegy Bank. [Finding of Fact No. 106.] Therefore, the cost here is $1,199,967.00.

The sum of $1,000,000.00, plus $173,704.00, plus $76,915.00, plus $911,956.00, plus $417,773.00, plus $1,199,967.00 equals $3,780,315.00. Therefore, the total damages to Bajjali are $3,780,315.00.

### (C) Special Damages

While the term special damages is not specifically defined in the Federal Rules of Civil Procedure, it has been interpreted to mean "those elements of damages that are the natural, but not the necessary, consequence of defendant's conduct, and usually stem from the particular circumstances of the case." *NTBS Storage & Retrieval, Inc. v. KardexSys., Inc.*, No. 3:98–CV–0996–M, 2001 U.S. Dist. LEXIS 24605, at *3 (N.D.Tex. Mar. 8, 2001) (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1310 at 700 (2d ed.1990)); *see also Tex. A&M Res. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 404 (5th Cir.2003) (finding special

damages to be unusual or indirect costs, beyond the ordinary consequences of a breach); *Berwick v. New World Network Int'l*, No. 06 Civ. 2641(JGK), 2007 WL 949767, at *14 (S.D.N.Y. Mar.27, 2007) (finding special damages insufficiently pled when the plaintiffs alleged damages to their reputation and generally alleged lost profits associated with a tortious interference claim) (citing *Dooner v. Keefe, Bruyette & Woods, Inc.*, No. 00 Civ. 572(JGK), 2003 WL 135706, at *5 (S.D.N.Y. Jan.17, 2003)). Indeed, in Texas state courts, lost profits have consistently been considered special damages. *Burke v. Union Pac. Res. Co.*, 138 S.W.3d 46, 66 (Tex.App–Texarkana 2004, pet. denied).

An award of special damages is inappropriate in this suit. Under Rule 8(a)(3), "[a] pleading that states a claim for relief must contain ... a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed.R.Civ.P. 8(a)(3);[33] *see also Lesikar v. Rappeport*, 33 S.W.3d 282, 305 (Tex.App.-Texarkana 2000, pet. denied) (finding that in order to be recoverable, special damages must be pled). Further, a plaintiff must have sufficient notice when special damages are being sought.[34] *Burke* 138 S.W.3d at 67 (Tex. App.-Texarkana 2004, pet. denied).

Bajjali does not satisfy the pleading requirements of Rule 8(a)(3). The complaint seeks only actual damages and does not specifically plead lost profit damages. [Finding of Fact No. 107.] While the complaint generally mentions actual and exemplary damages, nowhere do the Plaintiffs—here, Bajjali—discuss or plead for lost profit damages. Bajjali merely as-

**33.** Rule 8 is made applicable to the Adversary Proceeding pursuant to Bankruptcy Rule 7008.

**34.** This Court, like other courts, uses the terms "special damages" and "consequential damages" interchangeably. *See Lesikar*, 33 S.W.3d at 305.

serted at trial that he suffered lost profits. His passing testimonial reference to lost profit damages not only fails to satisfy Rule 8(a)(3), but also violates the requirement of sufficient notice for special damages. Thus, Bajjali has not met his pleading burden and may not recover damages for lost profits.

Further, even if this Court were to find that Rule 8(a)(3) is satisfied, Bajjali has failed to plead lost profits with specificity. According to Rule 9(g),[35] when "an item of special damage is claimed, it must be specifically stated." Fed.R.Civ.P. 9(g). Here, Bajjali has failed to plead special damages, let alone specifically state them. [Finding of Fact No. 107.] Therefore, in the alternative, this Court would deny recovery of lost profits pursuant to Rule 9(g).

■■■■■ Finally, even if this Court is incorrect in concluding that Bajjali's lost profits are special damages, Bajjali has failed to adduce testimony of actual lost profits. "The measure of damages for the loss of profits as consequential damages means net profits. Net profits means that what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business." *S. Plains Switching, Ltd. v. BNSF Ry.*, 255 S.W.3d 690, 705 (Tex.App.-Amarillo 2008, pet. denied). While not requiring precise calculation, the lost profits must still be shown to a reasonable certainty. *Id.* Damages may be awarded based on estimates of the facts in the case. *Id.* (citing *Interceramic, Inc. v. S. Orient R.R.*, 999 S.W.2d 920, 929 (Tex.App.-Texarkana 1999, pet. denied)).

Bajjali did not testify, nor did the Plaintiffs provide any evidence, that the borrowed $3,780,315.00 was tied to specific projects or that such projects would have generated any profit. While this Court would not require an exact dollar amount for lost profits, the number must still be reasonably certain. *S. Plains Switching*, 255 S.W.3d at 705. Therefore, because it is not reasonably certain that Bajjali would have lost any profitable business deals merely because he was forced to borrow $3,780,315.00,[36] even if lost profits are not considered special damages, this Court will not award lost profit damages due to insufficient evidence.

Therefore, this Court concludes that lost profits stemming from the breach of the Indemnification Clause are not actual damages, but instead special damages. Further, Bajjali has failed to satisfy the requirements of Rules 8(a)(3) and 9(g). Therefore, this Court denies an award of special damages. Moreover, even if this Court is incorrect in concluding that the lost profit damages are special damages, Bajjali neither adduced testimony nor introduced exhibits that lost profits were reasonably certain.

In sum, although this Court declines to award to Bajjali three types of damages which he seeks—damages relating to the Nondisparagement Clause, special damages, and liquidated damages—the Court does award to Bajjali actual damages relating to Perry's breach of the Indemnification Clause. The amount of the award is $3,780,315.00. The Court also awards attorneys' fees and court costs to Bajjali. Counsel for Bajjali is directed to submit

---

**35.** Rule 9 is applicable to the Adversary Proceeding pursuant to Bankruptcy Rule 7009.

**36.** Although it was the Wallace–Bajjali Partnership, not solely Bajjali, which borrowed the money to restructure the guaranteed loans, Bajjali is a partner of the Wallace–Bajjali Partnership, and therefore is personally liable for all of the loans the Wallace–Bajjali Partnership received. Thus, this Court concludes that Bajjali himself did mitigate the damages.

his firm's invoices to the Court within seven calendar days of the date that this Memorandum Opinion is entered on the docket. Further, counsel for Bajjali is to submit invoices to Perry's counsel within seven calendar days from the date that this Memorandum Opinion is entered on the docket to determine whether he agrees that the requested fees and expenses are reasonable or whether a separate hearing needs to be held on the reasonableness of the requested attorneys' fees to be awarded to Bajjali for prosecuting the complaint.

### ii. The Wallace Trusts' Damages

Although Perry breached the Indemnification Clause in relation to the Wallace Trusts, the Wallace Trusts have suffered no damages because the Wallace–Bajjali Partnership restructured the two loans which the Wallace Trusts had guaranteed—the Flagship Loan and the Bank of Texas Loans. [Finding of Fact Nos. 102 & 105.] Stated differently, because Bajjali and the Wallace Trusts had both guaranteed the Flagship Loan and the Bank of Texas Loans, when the Wallace–Bajjali Partnership mitigated the damages by restructuring these two loans, the Wallace Trusts necessarily benefitted by such restructuring because they did not have to come out of pocket at all; only Bajjali had to come out of pocket (by using assets of the Wallace–Bajjali Partnership to achieve the restructuring).[37] Thus, the Wallace Trusts incurred no damages.

### d. The Contract Claims and Nondischargeability under 11 U.S.C. § 523(a)(6)

 11 U.S.C. § 523(a)(6) states that "a discharge under section 727, 1141, 1228(a), or 1328(b) of this title does not discharge an individual debtor from any debt . . . [that is the result of] willful and malicious injury by the debtor to another entity." 11 U.S.C. § 523(a)(6). In explaining the meaning of § 523(a)(6), the Supreme Court has held that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that non-dischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). The Supreme Court has further held that "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of section 523(a)(6)." Id. at 64, 118 S.Ct. 974.

 The Fifth Circuit expanded on the Geiger interpretation of § 523(a)(6) by holding that "willful and malicious injury is a unitary concept entailing a single two-pronged test." Miller v. J.D. Abrams Inc. (In re Miller), 156 F.3d 598, 603 (5th Cir.1998). There must either be an "objective substantial certainty of harm or a subjective motive to cause harm." Id. at 606; see also Texas v. Walker, 142 F.3d 813, 823 (5th Cir.1998). When applying this two-pronged test, courts should look at the record as a whole, not simply focus on specific pieces of evidence. See Suggs v. Stanley (In re Stanley), 224 Fed.Appx. 343, 348 (5th Cir.2007) (holding that the bankruptcy court's finding of willful and malicious intent was not in clear error, based on a reading of the entire record).

 In analyzing the subjective motive to harm, the Honorable Marvin Isgur has noted that "the Fifth Circuit equated having a subjective motive to harm to acting with the desire to cause injury." Guerra & Moore, Ltd. LLP v. Cantu (In re Can-

---

37. There is nothing in the record to indicate that the Wallace Trusts were partners in the Wallace–Bajjali Partnership. The record indicates only that Wallace and Bajjali are the two partners in the Wallace–Bajjali Partnership. Thus, the Wallace Trusts have never had to come out of their own pocket to mitigate damages.

*tu* ), 400 B.R. 104, 108 (Bankr.S.D.Tex. 2008) (citing *In re Miller*, 156 F.3d at 604). "Moreover, § 523(a)(6)'s formulation triggers in the lawyer's mind the category 'intentional torts,' which generally require that the actor intend the *consequences* of an act, not simply the act itself." *Geiger*, 523 U.S. at 58, 118 S.Ct. 974. A creditor must prove the willful and malicious standard for § 523(a)(6) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Raspanti v. Keaty (In re Keaty* ), 397 F.3d 264, 270 (5th Cir.2005).

■ Perry willfully and maliciously breached the Purchase Agreement only in relation to Bajjali.[38] On September 22, 2006, Hoffman, Perry's administrative assistant, sent a provocative e-mail to Perry stating:

> They [Wallace and Bajjali] treat you with no respect and like a child. They sluff you off ... They will NOT DO AS YOU ASK IN A TIMELY MANNER and it thoroughly pisses me off ... Will, I am sorry but this is the most belittling e-mail and I certainly would not stand for anyone to talk to me that way.

[Finding of Fact No. 62.][39] Three days later, Perry responded in an e-mail to Hoffman, indicating a calculated plan to injure Wallace and Bajjali. The e-mail states:

> I wanted to let you know that I am going filing bankruptcy per my attorneys advice. Please do not worry as this is part of my big plan I am going to be hatching this week. Dave [Wallace] and Costa [Bajjali] think they can pull a

wool over my eyes they have no idea what is about to happen and I just love it. They [Wallace and Bajjali] will walk away with nothing after this week and oh Dave [Wallace] can kiss his political career goodbye. Costa [Bajjali] will be getting all the blame plus a hell of a lot of debt. The master is at work and I have them by there balls. Costa should have never sided with Dave.

[Finding of Fact No. 62.] Perry further alluded to a calculated plan to injure Wallace and Bajjali in a separate email that read, "the ball has started rolling now I cannot stop it about dave [Wallace]." [Finding of Fact No. 64.] Indeed, Perry intended to cause Bajjali to incur "a hell of a lot of debt" and to destroy Wallace's political career. [Finding of Fact No. 62.]

Moreover, Bajjali testified that Perry sent him multiple text messages stating that Bajjali would never see a dime of his money, further evidencing Perry's malicious intent. [Finding of Fact No. 89.] Additionally, Perry's conduct surrounding the dissolution of the Partnership showed a pattern of retaliation. In his e-mail to Hoffman, Perry alluded to the harm Wallace and Bajjali would suffer. [Finding of Fact No. 62.] Perry is also a sophisticated businessman. [Finding of Fact Nos. 7 & 8.] Therefore, he understood the consequences of his actions. Indeed, he intended that "big changes" take place at Perry Properties. [Finding of Fact No. 46.] Under all of these circumstances, this Court concludes that Perry also knew with substantial certainty that Bajjali would

---

38. Because Wallace was not a party to the Purchase Agreement, he may not invoke this document to obtain a conclusion from this Court that Perry willfully and maliciously injured him in relation to the Nondisparagement Clause. As for the Wallace Trusts, even though they are parties to the Purchase Agreement, there is insufficient evidence to show that Perry willfully and maliciously injured them like he did with respect to Bajjali.

39. Hoffman's e-mail to Perry was in response to an e-mail Bajjali sent to Perry, which Perry subsequently forwarded to Hoffman. [Pls.' Ex. No. 36.]

suffer harm from his (i.e., Perry's) failure to indemnify him from defaulting loans.

In contrast, there is no evidence suggesting that Perry acted with malice in relation to the Wallace Trusts. No evidence was presented that Perry had a subjective motive to harm the Wallace Trusts. Moreover, no evidence was presented indicating that Perry intended for the Wallace Trusts to incur costs in relation to Perry's failure to indemnify. Simply put, the Wallace Trusts were collateral damage, thus making a § 523(a)(6) non-dischargeability conclusion inappropriate.

Accordingly, under the circumstances described above, this Court concludes that Perry's acts evidence a subjective motive to cause harm to Bajjali. Alternatively, this Court concludes that Perry's actions had an objective substantial certainty of harm toward Bajjali. *In re Miller*, 156 F.3d at 606. As a result, any damages stemming from the breach of the Purchase Agreement are non-dischargeable as to Bajjali under § 523(a)(6).

### 2. Defamation Claims

#### a. Standing for Defamation Claims

■ To have standing in Texas state courts, "a plaintiff must be personally aggrieved; his alleged injury must be concrete and particularized, actual or imminent, and not hypothetical." *Inman*, 252 S.W.3d at 304–05. Whether a plaintiff has standing is determined as of the filing of a lawsuit in the trial court. *In re Vogel*, 261 S.W.3d at 921; *Tex. Ass'n*, 852 S.W.2d at 446 n. 9.

Perry's defamatory statements caused damage to both Wallace and Bajjali—specifically, to their personal and business reputations, as evidenced by, among other things, the testimony adduced from the following witnesses: (1) Kaleta testified that he is now cautious when conducting business with Wallace and Bajjali; [Find-

ing of Fact No. 78]; (2) McGrath testified that he extracted himself from all involvement with Wallace; [Finding of Fact No. 81]; (3) Wallace testified that his relationship with the Shahs deteriorated after they heard the allegations against Wallace; [Finding of Fact No. 82]; (4) Wallace also testified that Perry's accusations against Wallace severely damaged his political career; [Finding of Fact No. 83]; and (5) Wallace testified that the defamatory statements have negatively affected his family life, particularly his relationships with his wife and two daughters; indeed, at trial, Wallace noted with dejection that his ability to be a role model to his two daughters has been diminished. [Finding of Fact No. 83.] Notably, the aforementioned circumstances occurred only after Perry published the defamatory statements. Therefore, because the record indicates that Wallace and Bajjali were personally aggrieved and had their reputations harmed by the accusations of Perry, they have standing to sue for defamation. *See Inman*, 252 S.W.3d at 304–05.

#### b. Defamation Under Texas Law

■ To satisfy a claim for defamation, Texas law requires the plaintiff to prove the defendant engaged in the following actions: "(1) published a statement; (2) that was defamatory concerning the plaintiff; and (3) while acting with either actual malice, if the plaintiff was a public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement." *Grand Champion Film Prod., L.L.C. v. Cinemark USA, Inc.*, 257 S.W.3d 478, 481 (Tex.App.-Dallas, 2008, no pet.) (citing *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998)).

#### i. Published Statements

■ A statement is published when it is said orally, put into writing or in print,

and the statement was published in such a way that third parties are capable of understanding its defamatory nature. *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex.App.-Dallas 2003, no pet.) (citing *Ramos v. Henry C. Beck Co.*, 711 S.W.2d 331, 335 (Tex.App.-Dallas 1986, no writ)); *see also Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 396 (Tex.App.-Houston [1st Dist.] 1993, writ dism'd, w.o.j.). A third party is deemed to have understood the defamatory nature of a statement if a reasonable person would have understood the statement under the circumstances. *Marshall Field Stores*, 859 S.W.2d at 396 (citing *First State Bank of Corpus Christi v. Ake*, 606 S.W.2d 696, 701 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.)). An e-mail, just like a letter or a note, is a means for a statement to be published so that third parties are capable of understanding the defamatory nature of the statement. Accordingly, this Court concludes that an e-mail sent to third parties constitutes publication for defamation purposes. *Van Nguyen v. Hoang*, No. 01–07–00136–CV, 2009 WL 469347, at *2-3 (Tex. App.-Houston [1st Dist.] Feb. 26, 2009, no pet.) (noting that the sending of an e-mail constitutes publication for defamation purposes).

### ii. Defamatory Statements

■ A statement is defamatory when "it tends to injure a person's reputation and thereby expose[s] the person to public hatred, contempt, ridicule, or financial injury, or [where it] impeach[es] any person's honesty, integrity, virtue, or reputation." *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 580 (Tex.App.-Austin 2007, pet. denied) (citing TEX. CIV. PRAC. & REM.CODE ANN. § 73.001).

■ A published statement must be a false statement of fact to be defamatory in nature. *Skipper v. Meek*, No. 03–05–00566–CV, 2006 WL 2032527, at *7 (Tex. App.-Austin, July 21, 2006, no pet.) (citing *Abbott v. Pollock*, 946 S.W.2d 513, 519 (Tex.App.-Austin 1997, writ denied)). Further, the statement must be objectively, verifiably false. *Id.* (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)).

■ In Texas, the burden is on the plaintiff to prove the falsity of a defamatory statement, whether the statement is made about private individuals or public officials. *See Bentley v. Bunton*, 94 S.W.3d 561, 586 (Tex.2002) (holding that public officials must prove the defamatory statements made are false); *Bandy v. White*, No. 03–01–00444–CV, 2002 WL 1727994, at *5 (Tex.App.-Austin July 26, 2002, no pet.) (concluding that the plaintiff has the burden to prove falsity in a suit between private individuals); *KTRK Television v. Felder*, 950 S.W.2d 100, 105 (Tex. App.-Houston [14th Dist.] 1997, no writ) (concluding that a private individual plaintiff bears the burden of showing falsity to recover against media defendant). The plaintiff must prove the falsity of a statement by a preponderance of the evidence. *Bentley*, 94 S.W.3d at 587; *Turner*, 38 S.W.3d at 117.

■ For a statement to be defamatory, plaintiffs must show that any defamatory publications "concerned" or referred to them. *Kaufman v. Islamic Soc'y of Arlington*, 291 S.W.3d 130, 144 (Tex.App.-Fort Worth 2009, pet. denied) (citing *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 429 (Tex.2000)). "A person is referred to in a defamatory statement if he is named in the statement or if those who know the person would understand that the statement was referring to the person." *Ledig v. Duke Energy Corp.*, 193 S.W.3d 167, 180 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (citing *Newspapers,*

268

*Inc. v. Matthews*, 161 Tex. 284, 339 S.W.2d 890, 893 (1960)). "[B]y omitting key facts and falsely juxtaposing others, a publication may be both false and defamatory." *Houseman v. Publicaciones Paso del Norte*, 242 S.W.3d 518, 525 (Tex.App.-El Paso 2007, no pet.) (citing *Turner* 38 S.W.3d at 118 (Tex.2000)). To determine whether a statement is defamatory, "[a] defamatory publication should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 154 (Tex.2004) (quoting *Turner* 38 S.W.3d at 114 (Tex.2000)) (internal quotation marks omitted). "Common sense requires courts to understand the statement as ordinary men and women would." *Moore v. Waldrop*, 166 S.W.3d 380, 385 (Tex.App.-Waco 2005, no pet.).

### iii. Actual Malice or Negligence

 To determine whether a standard of actual malice or negligence should apply to a defamatory statement, this Court must first determine whether Wallace and Bajjali are each: (1) a general-purpose public figure; (2) a limited purpose public figure; (3) a public official; or (4) a private individual. *WFAA–TV*, 978 S.W.2d at 571. A public official is considered a private individual if the defamatory statements are not related to his official conduct. *Foster v. Laredo Newspapers*, 541 S.W.2d 809, 817–18 (Tex.1976).

### (A) Wallace and public official status

 As mayor of Sugar Land, Texas and a candidate for Congressional District number 22, [Finding of Fact Nos 17, 66], Wallace maintained the status of a public official with respect to all statements related to his public office. A mayor is considered a public official for defamation purposes. *See Turner*, 38 S.W.3d 103, 109

(Tex.2000) (concluding that a mayoral candidate was a public official for defamation purposes). A defendant must act with actual malice if the defamatory statements are related to the official conduct of the public official. *Foster*, 541 S.W.2d at 812.

 A defendant acts with actual malice if the defamatory statement is made with "knowledge that it was false or with reckless disregard of whether it was false or not." *WFAA–TV*, 978 S.W.2d at 571 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 289–90, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Reckless disregard requires a high degree of probability that the statement was false; moreover, the defendant must subjectively suspect falsity of the defamatory statements. *St. Amant v. Thompson*, 390 U.S. 727, 732–33, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Bentley*, 94 S.W.3d at 595–96. To satisfy actual malice, it is not sufficient that a prudent person would have verified the facts. *See St. Amant*, 390 U.S. at 731, 88 S.Ct. 1323; *Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 (Tex.2005). "[E]vidence that a failure to investigate was contrary to a speaker's usual practice and motivated by a desire to avoid the truth may demonstrate the reckless disregard required for actual malice." *Bentley*, 94 S.W.3d at 591. A plaintiff may prove a defendant's state of mind using circumstantial evidence, and motive may bear a relation to the actual malice inquiry. *Harte–Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Further, one may not automatically overcome evidence of actual malice merely by believing that the statements made were true. *St. Amant*, 390 U.S. at 732, 88 S.Ct. 1323.

Here, Wallace testified that he was the mayor during the time the defamatory statements were released. [Finding of

Fact No. 17.] [40] Additionally, Wallace was a candidate for Congressional District 22 during part of the events in question. [41] [Finding of Fact Nos. 26, 33 & 71.] Accordingly, Wallace maintains a public official status with regard to the defamatory statements made about him related to his public official status. This Court finds that all the statements made regarding Wallace are in relation to his public official position. Therefore, the actual malice standard will apply to all statements made relating to Wallace.

(B) Bajjali and private individual status

 Bajjali maintains the status of a private individual in relation to all defamatory statements made against him. A private individual, for the purpose of a defamation action, is any individual who is not considered a public figure, limited purpose public figure, or public official. *Foster,* 541 S.W.2d at 818. An individual who does not engage the attention of the public—in a prominent manner—in an attempt to resolve a public question or issue is generally considered a private individual. *See Wolston v. Reader's Digest Ass'n,* 443 U.S. 157, 168, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979).

 A defendant need only act in a negligent manner when making statements about a private individual to be liable for defamation. *WFAA–TV,* 978 S.W.2d at 571 (citing *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989)). Texas courts have defined negligence in the defamation context as the "failure to investigate the truth or falsity of a statement before publication, and [the] failure to act as a reasonably

prudent [person]." *Marathon Oil Co. v. Salazar,* 682 S.W.2d 624, 631 (Tex.App.-Houston [1st Dist.] 1984, writ ref'd n.r.e.) (citing *El Paso Times, Inc. v. Trexler,* 447 S.W.2d 403, 406 (Tex.1969)).

 Bajjali qualifies under the private individual standard. Bajjali has never been elected to, or run for, public office. Indeed, Bajjali was a former program manager for Dell Corporation who became involved in real estate development in 2004. [Finding of Fact No. 21.] No exhibits were introduced, and no testimony was adduced, that Bajjali assumed extensive prominence in the resolution of public issues. Therefore, Bajjali is considered to be a private individual in relation to his defamation action against Perry.

*c. Perry Defamed Wallace and Bajjali*

*i. The Blog*

(A) Perry published the defamatory statements

 As discussed *supra,* the sending of an e-mail is considered publication for defamation purposes. Perry published the defamatory statements relating to Wallace when he sent several individuals a link to the Blog. [Finding of Fact No. 75.] Indeed, the Blog contained several defamatory statements regarding Wallace. For example, the Blog insinuated that Wallace was an armsdealer. [Finding of Fact No. 76.] Therefore, Perry's e-mails constitute a publication based upon Texas law. Further, Perry published the information from the Blog by informing Frishberg of the

---

**40.** Wallace was mayor from 2002–2008. The evidence shows that Perry made the defamatory statements at various times during this period. For example, Perry e-mailed Hoffman on September 21, 2006 with a link to the Blog, instructing her to print it out and anon-

ymously distribute it. [Finding of Fact No. 75.]

**41.** For example, Perry e-mailed Hoffman on September 21, 2006 with a link to the Blog, instructing her to print it out and anonymously distribute it. [Finding of Fact No. 75.]

contents within the Blog. [Finding of Fact No. 51.]

### (B) Defamatory Statements in the Blog Concerned Wallace

■ The Blog asserts, as fact, that: (1) Mark Thatcher earned millions of dollars as an arms dealer selling weapons to Saudi Arabia; and (2) Mark Thatcher helped finance a coup attempt in Equatorial Guinea. [Pls.' Ex. No. 21.] Using common sense and examining these assertions in the Blog "in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it," this Court concludes that they both concerned and defamed Wallace.

The Blog is written in such a way that the accusations against Mark Thatcher are imputed to Wallace. This objective was accomplished by making the subject of the Blog posting solely about Wallace while omitting important facts and falsely juxtaposing others. *Houseman,* 242 S.W.3d at 525. First, the title of the Blog posting is "Some Info On David Wallace." [Pls.' Ex. No. 21.] There is absolutely no reference in the title to Mark Thatcher; hence, a person of ordinary intelligence would believe that the Blog concerns Wallace. The author of the Blog wrote a short introduction to the Blog entry before posting a block of text containing numerous negative statements about Wallace. The introduction reads as follows:

> Some folks have asked why I believe David Wallace to be unethical, corrupt, and unfit to represent the GOP in the CD22 Congressional race, even as a write-in with no significant chance of winning. Well, I received the following

item tonight that supplies a neat summary of the problems with David Wallace. I have all or almost all of the documents and articles in question, though I was having difficulty uploading them for my site

[Pls.' Ex. No. 21.]

After introducing the Blog, the author posts what he titled "[an] item … that supplies a neat summary of the problems with David Wallace." [Pls.' Ex. No. 21.] This "neat summary" proceeds to link Wallace and Mark Thatcher so closely that the actions of Mark Thatcher are impliedly imputed to Wallace. For example, near the very beginning of the Blog posting, it states that "A November 23, 1991 article in the Guardian (London) identifies Wallace as a business partner of Mark Thatcher, son of former British Prime Minister Margaret Thatcher. The article reports that Wallace and Thatcher were business partners in a firm identified as Emergency Networks, Inc. C." [Pls.' Ex. No. 21.] Importantly, the Blog posting has no sort of paragraph structure, flowing from one negative sentence about Wallace to another. This format contributes to the linking of Wallace to Mark Thatcher. As another example, a section of the posting discussing Wallace's alleged wrongdoings at Emergency Networks, Inc. flows directly into a section discussing Mark Thatcher's alleged arms dealings with Saudi Arabia.[42] [Pls.' Ex. No. 21.] Moreover, sandwiched between two sections discussing Mark Thatcher's alleged involvement in selling weapons to Saudi Arabia is the following allegation:

> An October 10, 1994 article in The Guardian (London) reported that David

---

**42.** An example of this "stream of consciousness" writing style reads as follows: "An October 17, 1994 article in The Independent—London [sic] Emergency Networks, Inc. was placed in Chapter 7 bankruptcy in 1994. A

November 25, 1992 article in The Guardian (London) states that a secret United States government communications [sic] identified Mark Thatcher as being involved in a Saudi Arabia arms deal." [Pls.' Ex. No. 27.]

Wallace and Mark Thatcher were partners in Grantham Company, an investment company that would "look for companies on hard times and put up the money with some hands-on management" said one associate. The article also reported that Thatcher in 1992 was named in a U.S. court [sic] in connection with a $4 billion payment to a Saudi national by Rolls–Royce and British Aerospace to help them with a defense contract with Saudi Arabia.

[Pls.' Ex. No. 21.]

A similar juxtaposition is used in linking allegations that Mark Thatcher helped finance a coup attempt in Equatorial Guinea to Wallace: "[A]n April 5, 2005 Dallas Morning News article reported that Mark Thatcher in a plea bargain agreement [sic] pleaded guilty in South Africa to helping finance a coup attempt in Equatorial Guinea.... An October 2, 1994 article in The Observer Newspaper ... revealed that Mark Thatcher and his business partner were being sued under anti-racketeering, or RICO, legislation." [Pls.' Ex. No. 21.] Moreover, other quotations are juxtaposed within the Blog posting, with little or no context, linking Wallace to Mark Thatcher and arms dealings. The Blog posting states that "The 4/25/95 article in The Sunday Times reported that Grechen Hyland, a financial controller of Ameristar [sic] claimed that 'Wallace wired large sums of money to Indonesia without supporting documents. I lost count of how many times I requested documents of these outgoing wire transfers.'" [Pls.' Ex. No. 21.] Indeed, the Blog alleges that "A January 22, 1995 article in the Mail on Sunday (London) reported that Barnet Skelton, Jr. an attorney investigating Ameristar [sic] stated that *Wallace was simply a pawn of Mark Thatcher.*" [Pls.' Ex. No. 21] (emphasis added). The Blog goes on to post that Wallace used Thatcher's money to take over Ameristar. [Pls.' Ex. No. 21.]

Finally, the Blog not only alleges that Margaret Thatcher viewed Wallace as a negative influence on her son, but also further linked Mark Thatcher's actions to Wallace. Specifically, the Blog alleges that:

Margaret Thatcher was encouraging her son Mark to "distance himself from Wallace" and that Wallace was asked by Ms. Thatcher to resign as Treasurer of her Foundation.... It appears that David Wallace and Mark Thatcher were business partners in at least two failed businesses from about 1990, shortly after Wallace filed personal bankruptcy [sic] until 1995 when the suit by Laughlin was settled, during the time that Thatcher was identified as profiting from arms deals involving Saudi Arabia and Iraq.

[Pls.' Ex. No. 21.]

The juxtaposition of alleged facts, stating numerous times that Mark Thatcher and Wallace were business partners in a number of ventures, interspersed with numerous allegations that Mark Thatcher was involved in arms dealings and attempted to overthrow the government of Equatorial Guinea, while omitting key facts—specifically, that Wallace himself has not specifically been accused of selling weapons or attempting coups—leads this Court to conclude that a person of ordinary intelligence would impute allegations of arms dealings and attempted coups to Wallace. Therefore, allegations in the Blog concern Wallace and are defamatory.

### (C) Perry satisfies the actual malice standard

█ A defendant must act with actual malice if the defamatory statements are related to the official conduct of the public official. *Foster*, 541 S.W.2d at 812 (quoting *Sullivan*, 376 U.S. at 279–80, 84 S.Ct.

710). Here, the Blog insinuated—among other things—that Wallace was an arms dealer. [Finding of Fact No. 76.] This Court finds that acting as an arms dealer relates to one's position as a public official because it impugns the official's loyalty, integrity, and morality.[43] Therefore, the Court will apply the actual malice defamation standard to the publication of the Blog.

■ In this instance, Perry satisfies the actual malice standard, which requires that Perry act "with reckless disregard as to [the] truth or falsity" of the defamatory publication. *Bentley*, 94 S.W.3d at 600. Here, Perry made no serious attempt to verify the information on the Blog. [Finding of Fact No. 73.] He asserts that he sent the website to his attorneys to investigate, but failed to provide any evidence to corroborate this testimony; [Finding of Fact No. 76]; the Court finds that his testimony on this point is wholly unreliable. Moreover, Perry's e-mail to Hoffman in which he stated that Wallace could "kiss his political career goodbye" and that Perry has "them by there [sic] balls" further evidences the fact that Perry knew the Blog contained false statements. [Finding of Fact No. 62.] Further, Prestage, the Fort Bend County Commissioner, testified that in a telephone conversation, Perry threatened him by saying: "[d]on't f— with me, I will destroy you like I did David Wallace." [Finding of Fact No. 45.] Per-

ry was unhappy with both how the Partnership was being run and how Bajjali and Wallace treated him. Moreover, Perry told Kaleta that Wallace's career in politics was over. [Finding of Fact No. 72.] The e-mail to Hoffman, the threat to Prestage, and the comment to Kaleta provide this Court with more than sufficient evidence to conclude that when Perry published the Blog, he acted with actual malice or, alternatively, with reckless disregard of the truth. Therefore, this Court concludes that Perry committed defamation in publishing the Blog to certain individuals.[44]

### ii. Kickbacks

#### (A) Perry published the defamatory statements

Perry admitted that he published the "kickback" statements to the Shahs through e-mail. Further, Perry admitted to communicating the "kickback" statements to Arora, Tielke, and Hoffman. [Finding of Fact No. 47.] Therefore, Perry published the "kickback" statements, thus satisfying a necessary element for a defamation cause of action.

#### (B) Perry satisfies the actual malice standard in relation to Wallace

■ In Perry's testimony, he admitted that he accused Wallace of receiving kickbacks. [Finding of Fact No. 47.] Accusing a public official of receiving kickbacks relates to his public office because it impugns the integrity of that public official.

---

**43.** Indeed, at a recent sentencing hearing for a convicted arms dealer, the Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, noted that it was "a tragedy that [the arms dealer] has spent so much of his life in activities that certainly were not calculated to advance the human race." Benjamin Weiser, *An Arms Dealer is Sentenced to 30 Years in a Scheme to Sell Weapons to Terrorists*, N.Y. Times, Feb. 24, 2009, at A25.

**44.** This Court finds that Wallace unequivocally disproved the allegations in the Blog. Wallace convincingly testified that he was never involved in any arms dealings, nor was he aware of any arms dealings of Thatcher. [Finding of Fact No. 14.] Wallace also convincingly testified that he was never involved in a plan to overthrow the government of Equatorial Guinea. [Finding of Fact No. 15.] Therefore, the Court concludes that Wallace proved that the allegations in the Blog were completely false.

Accordingly, this Court will apply the actual malice standard when determining whether Perry committed defamation when he accused Wallace of receiving kickbacks.

■ Here, Perry asserted that the only reason he accused Wallace of receiving kickbacks was due to the fact that when he asked for accounting records relating to a tenant improvement buildout, either he was not provided them, or the records did not exist. [Finding of Fact. No. 47.] Perry admitted in his testimony that he had no evidence to substantiate his suspicion that Wallace was receiving kickbacks. [Finding of Fact No. 95.] Moreover, Perry made no attempt to investigate his suspicions before telling others that Wallace was receiving kickbacks. [Finding of Fact Nos. 47 & 95.] Further, the reasons set forth in the defamation analysis *supra*, regarding Perry's email to Hoffman and Perry's statement to Prestage, also apply here. Therefore, this Court concludes that Perry acted with actual malice in informing others that Wallace received kickbacks. Thus, Perry committed defamation when he published statements that Wallace received kickbacks.[45]

### (C) Perry satisfies the negligence standard in relation to Bajjali

■ The allegation that Bajjali was receiving kickbacks was directed at Bajjali, a private individual, and did not concern a matter of public importance. When a defamatory statement is made regarding a matter of private concern, "the person cannot recover unless the publisher of the alleged libel knew or should have known the statement was false." *Lomas Bank USA v. Flatow,* 880 S.W.2d 52, 54 (Tex. App.-San Antonio 1994, writ denied).

■ Here, Perry was negligent in making the statement that Bajjali received kickbacks. Perry's only reason for making the statement was that he was lacking certain accounting records, specifically, records relating to a tenant improvement buildout. [Finding of Fact No. 47.] Further, as explained *supra*, Perry made no effort to investigate his allegation. Therefore, this Court concludes that Perry was negligent in publishing the statement that Bajjali received kickbacks. Thus, Perry committed defamation when he published the statement that Bajjali was receiving kickbacks, thereby satisfying a necessary element for a defamation cause of action.[46]

### iii. Fraud Allegations

#### (A) Perry published the defamatory statements

Perry sent an e-mail to McGrath in which he asserted that Wallace and Bajjali were trying to "extort more money," had committed "gross fraud," and had committed "serious crimes." [Finding of Fact No. 65.] McGrath testified that he received approximately multiple text messages from Perry which accused Wallace and Bajjali of similar allegations. [Finding of Fact No. 65.] McGrath, however, could not recall the exact content of the text messages. [Finding of Fact No. 65.] As discussed *supra*, sending an e-mail con-

---

**45.** This Court also finds Perry's accusations that Wallace received kickbacks to be patently false. [Finding of Fact No. 95.] Once again, this Court finds Perry's testimony to lack any credibility.

**46.** Further, the accusation that Bajjali received kickbacks is completely false. Bajjali convincingly testified that he has never been charged or convicted of a crime. [Finding of Fact No. 22.] Indeed, Bajjali unequivocally and very credibly testified that he has never been investigated for any alleged criminal activity. [Finding of Fact No. 22.]

stitutes publication for defamation purposes. Further, McGrath's testimony and the language in the e-mail establishes that Perry made accusations against Wallace and Bajjali, accusing them of extortion, fraud, and other serious crimes. [Finding of Fact No. 65.] Moreover, Perry repeatedly expressed to Lunsford and Frishberg that Wallace was an incompetent businessman, had illegally transferred funds to himself, and had forged checks. [Finding of Facts Nos. 48 & 50.] Therefore, Perry published the defamatory statements, thus satisfying a necessary element for a defamation action.

### (B) Perry satisfies the actual malice standard in relation to Wallace

Accusing a public official of fraud, extortion, and other serious crimes impugns the integrity of that specific public official. As such, the defamatory statements relate to the public official's office, and thus must be analyzed pursuant to the actual malice standard for defamation.

Perry asserted at trial that he believed Wallace had committed extortion, gross fraud, and other serious crimes. Yet, Perry provided no credible evidence upon which to support his belief. This Court finds that no reasonable person would conclude that extortion, gross fraud, or other serious crimes had been committed based upon the testimony given by Perry at trial. Further, this Court's discussion of Perry's e-mail to Hoffman, Perry's statement to Kaleta, and Perry's conversation with Prestage—discussed *supra*—unequivocally establish that Perry acted with actual malice in the publication of the defamatory statements. Therefore, this Court concludes that Perry acted with actual malice when he e-mailed and texted McGrath the defamatory statements. Accordingly, Perry committed defamation against Wallace.

### (C) Perry satisfies the negligence standard in relation to Bajjali

At trial, Perry introduced no credible evidence to justify his accusations against Bajjali. This Court concludes that a reasonably prudent person would not assume extortion, gross fraud, or serious crimes had been committed based upon the evidence presented at trial. Therefore, because Perry failed to adequately investigate his suspicion and did not act as a reasonably prudent person, he acted negligently when he published the statement that Bajjali committed extortion, gross fraud, or other serious crimes. Thus, Perry defamed Bajjali.

### d. Defamation per se

For a published false statement to qualify as defamation *per se* in Texas, the statement must "unambiguously and falsely impute [ ] criminal conduct to [the] plaintiff." *Gray v. HEB Food Store # 4*, 941 S.W.2d 327, 329 (Tex.App.-Corpus Christi 1997, writ denied). A statement may constitute defamation *per se* "if it injures a person in his office, profession, or occupation." *Knox v. Taylor*, 992 S.W.2d 40, 50 (Tex.App.-Houston [14th Dist.] 1999, no pet.). "[S]tatements that are defamatory per se are actionable without proof of injury." *Tex. Disposal*, 219 S.W.3d at 580 (citing *Bentley*, 94 S.W.3d at 604).

Here, Perry committed defamation *per se* in relation to all defamation actions. First, the Blog wrongly imputes criminal conduct to Wallace. Second, allegations of kickbacks, fraud, and other serious crimes impute criminal conduct to both Wallace and Bajjali. Third, all of the defamation actions injure Wallace and Bajjali in their office, occupation, or professional capacity. Therefore, this Court concludes

that all of the defamation actions constitute defamation *per se.*

### e. Defamation Damages

▮ Where defamation has occurred, this Court must determine actual damages. "Actual damages are divided into general (direct) and special (consequential) damages." *Fox v. Parker*, 98 S.W.3d 713, 726 (Tex.App.-Waco 2003, pet. denied) (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex.1997)) (internal quotation marks omitted). Moreover, "[u]nder Texas law, courts of equity have the power to assess exemplary damages." *Franklin Bank, S.S.B. v. Barnes (In re Barnes )*, 369 B.R. 298, 311 (Bankr.W.D.Tex.2007) (citing *Mims v. Kennedy Capital Mgmt., Inc. (In re Performance Nutrition, Inc.)*, 239 B.R. 93, 115 (Bankr.N.D.Tex.1999)). The Court now discusses these damages in turn as they apply to this lawsuit.

### i. General Damages

▮ Courts define general damages as "those conclusively presumed as a matter of law to have been foreseen by the defendant as a necessary and usual result of the defendant's wrongful act." *Id.* Indeed, they do not have to be specifically pled. *Id.* (citing *Green v. Allied Interests, Inc.*, 963 S.W.2d 205, 208 (Tex.App.-Austin 1998, pet. denied)). Where the court finds defamation *per se*, "the law presumes that a person's reputation has been injured thereby," and allows the injured party to "recover general damages, such as for mental anguish, without proof of injury." *Id.* (citing *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex.1984)) (internal quotation marks omitted). Moreover, the injured party does not have to prove proximate cause for general damages. *Id.* Where damages are presumed, however, the extent of the harm must be

proven to recover more than nominal damages. *See Tex. Disposal*, 219 S.W.3d at 584 ("Although the amount of actual general damages remains a question for the jury ... the plaintiff is entitled to an award of at least one dollar in nominal damages."); *Denton Publ'g Co. v. Boyd*, 448 S.W.2d 145, 147 (Tex.Civ.App.-Fort Worth 1969), *aff'd*, 460 S.W.2d 881 (Tex. 1970) (concluding that, at the very least, nominal damages should be awarded).

▮ The amount of general damages suffered in a defamation case is difficult to determine and is generally left to the discretion to the finder of fact, subject only to a determination that the award was clearly excessive or the result of "passion, prejudice, or other improper influences." *Morrill v. Cisek*, 226 S.W.3d 545, 549 (Tex. App.-Houston [1st Dist] 2006, no pet.) (citing *Bolling v. Baker*, 671 S.W.2d 559, 571 (Tex.App.-San Antonio 1984, writ dism'd w.o.j.)); *see also Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 922 (Tex.App.-Corpus Christi 1991, writ dism'd w.o.j.). Even when the victim is a public official, general damages may be inferred from statements that are defamatory *per se. See Bentley*, 94 S.W.3d at 604; *Tex. Disposal*, 219 S.W.3d at 575.

▮ Because Perry committed defamation *per se*, general damages, such as mental anguish damages, may be presumed. *Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 501 (Tex.App.-Houston [14th Dist.] 2008, pet. denied) (concluding that mental anguish damages are general damages). Specific testimony implied mental anguish; for example, when McGrath heard the allegations regarding Wallace, he resigned as the trustee of the Wallace Trusts' and has since refused to do business with Wallace or Bajjali. [Finding of Fact Nos. 81.] Furthermore, Perry caused e-mails about Wallace's alleged conduct to be sent to many of Wallace's business associates,

which resulted in strained relations between Wallace and the Shahs. [Finding of Fact No. 82.] Additionally, Wallace's political career was heavily damaged by Perry's defamatory publication. [Finding of Fact No. 83.] Moreover, Wallace's relationship with his wife and his daughters has suffered due to the defamatory statements levied against him. [Finding of Fact No. 83.] Wallace suffered mental anguish and a diminished reputation, as well as damage to his political career, qualifying him for more than mere nominal general damages. Bajjali suffered damage to his business reputation. Accordingly, both Wallace and Bajjali are entitled to more than mere nominal damages.

As noted previously, the amount of general damages for defamation is left to the wide discretion of this Court. *Morrill*, 226 S.W.3d at 549. The Court awards differing amounts of general damages to Bajjali and Wallace for the reasons set forth herein. Perry falsely accused Bajjali of receiving kickbacks and committing extortion, gross fraud, and serious crimes. Perry falsely accused Wallace of these same bad acts, but, in addition, published the Blog (which implied that Wallace, among other things, was an arms dealer and that he attempted to overthrow the government of Equatorial Guinea). [Finding of Fact Nos. 15 & 76.] Because Perry falsely accused Wallace of more bad acts than Bajjali, the Court concludes that Wallace should be awarded a greater amount of general damages for defamation. The Court concludes that Bajjali is entitled to $10,000.00 for each category of false accusation made against him. Thus, he is entitled to $40,000.00 because Perry accused him of:

(1) receiving kickbacks; (2) committing extortion; (3) committing gross fraud; and (4) committing serious crimes. The Court further concludes that Wallace is entitled to $10,000.00 for each category of false accusation against him. Thus, he is entitled to $60,000.00 because Perry accused him of: (1) receiving kickbacks; (2) committing extortion; (3) committing gross fraud; and (4) committing serious crimes. Additionally, Perry published the Blog, which insinuated that Wallace was an arms dealer; and attempted to overthrow the government of Equatorial Guinea.[47]

### ii. Special Damages

■ Damages that do not fall under the category of general damages are considered special—i.e., consequential—"which must be foreseeable to the defendant but are not the necessary and usual result of the wrong." *Fox*, 98 S.W.3d at 726 (citing *Arthur Andersen*, 945 S.W.2d at 816). As discussed *supra*, special damages must be specifically pleaded.

Here, the Plaintiffs' complaint merely states that "Plaintiffs suffered damages because of Debtor's actions ... Plaintiffs seek a judgment for [a]ctual damages." [Adv. Docket No. 1, ¶ 51.] Accordingly, the pleadings fail to give fair notice of any special damages being asserted against Perry. Therefore, the Court will not award special damages.

### iii. Punitive or Exemplary Damages

■■ Bankruptcy courts are considered courts of equity by the Supreme Court. *United States v. Energy Res. Co.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990). Moreover, "[u]nder

---

**47.** Wallace had a business relationship with Mark Thatcher, the son of the thrice-elected Prime Minister of England, Lady Margaret Thatcher. As the son of the British Prime Minister, it is not implausible that one could be led to believe that he has international contacts who have the capability of attempting to overthrow the government of Equatorial Guinea. Therefore, it is also not implausible that one could be led to believe that Wallace had some involvement in attempting to overthrow this government.

Texas law, courts of equity have the power to assess exemplary damages." *Franklin Bank*, 369 B.R. at 311 (citing *Mims* 239 B.R. at 115 (Bankr.N.D.Tex.1999)). Although 11 U.S.C. § 523(a)(6) does not provide for exemplary damages, "[a] bankruptcy court may rely on state law to award exemplary damages where the Code does not specifically allow such measures." *Smith v. Lounsbury (In re Amberjack Interests, Inc.)*, 326 B.R. 379, 391 (Bankr. S.D.Tex.2005) (citing *In re Landbank Equity Corp.*, 83 B.R. 362, 382 (E.D.Va. 1987)); *see also In re A.G Fin. Serv. Ctr., Inc.*, 395 F.3d 410, 414 (7th Cir.2005).

For a defamation claim, statements made with "malice raises . . . conduct to that type of egregiousness that justifies punitive damages." *Peshak v. Greer*, 13 S.W.3d 421, 426 (Tex.App.-Corpus Christi 2000, no pet.). In this context, malice is defined as a "specific intent by the defendant to cause substantial injury or harm to the claimant." Tex. Civ. Prac. & Rem.Code Ann. § 41.001(7). Moreover, "[s]pecific intent means that the actor desires to cause the consequences of his act, or that he believes the consequences are substantially certain to result from it." *Franklin Bank*, 369 B.R. at 311 (quoting *Mission Resources, Inc. v. Garza Energy Trust*, 166 S.W.3d 301, 313 (Tex.App.-Corpus Christi 2005), *rev'd on other grounds*, 268 S.W.3d 1 (Tex.2008)) (internal quotation marks omitted). Malice may be proved through either direct or circumstantial evidence. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex.1994). Thus, if a plaintiff proves that the defendant's defamatory statements were made with malice by clear and convincing evidence, a court may impose punitive or exemplary damages. *Bentley*, 94 S.W.3d at 596–97 ("[E]vidence is clear and convincing if it supports a firm conviction that

the fact[s] to be proved [are] true.") (citing *Huckabee* 19 S.W.3d at 422).

Here, the Plaintiffs have shown by clear and convincing evidence that Perry clearly published the defamatory statements against Wallace and Bajjali with a malicious intent to injure the reputations of his former colleagues, as described herein. [Finding of Fact Nos. 41, 45, 48–56, 65, 75, 80 & 93.] Even Bob Perry, Perry's own father, described his son's behavior as "ugly," testifying that "whoever put those words down on paper, it's ugly." [Finding of Fact No. 63]; [Pls.' Ex. No. 30.] This Court finds that Perry desired to cause the consequences of his acts, and concludes that Perry maliciously defamed Wallace and Bajjali. Therefore, this Court will impose punitive damages on Perry for his defamatory statements.

Exemplary damages must be reasonably proportioned to actual damages in order to be recovered. *Sw. Inv. Co. v. Neeley*, 452 S.W.2d 705, 707 (Tex.1970) (citing *Fort Worth Elevators Co. v. Russell*, 123 Tex. 128, 70 S.W.2d 397, 409 (1934)). When assessing punitive damages, courts should take into account the following factors: "(1) the nature of the wrongdoing, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety." *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 925 (Tex.1998); *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981) (quoting *First Sec. Bank & Trust Co. v. Roach*, 493 S.W.2d 612, 619 (Tex.Civ. App–Dallas 1973, writ ref'd n.r.e.)); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 41.011 (requiring trial courts to discuss the *Kraus* factors when determining the amount of exemplary damages). The Court now applies these five factors in

order to determine the amount of punitive damages to which Bajjali is entitled and to which Wallace is entitled.

### (A) Determination of Bajjali's Punitive Damages

#### (i) Nature of Wrongdoing

The first factor a trial court should take into account when determining the amount of a punitive damage award is the nature of the wrongdoing. *Mobil Oil Corp.*, 968 S.W.2d at 925. Here, Perry asserted in an e-mail that Bajjali had committed extortion, gross fraud, and other serious crimes. [Finding of Fact No. 65.] Further, Further, Perry communicated to a number of people—the Shahs, Hoffman, Tielke, and Arora-that Bajjali was receiving kickbacks. [Finding of Fact No. 47.] Accordingly, this factor heavily weighs in favor of awarding some amount of punitive damages to Bajjali.

#### (ii) Character of Conduct

The second factor a trial court should take into account in determining the amount of a punitive damage award is the character of the conduct involved. *Id.* Here, Perry sent a some e-mails to one person—McGrath—asserting that Bajjali had committed extortion, gross fraud, and other serious crimes. [Finding of Fact No. 65.] Further, Perry communicated to a number of people—the Shahs, Hoffman, Tielke, and Arora—that Bajjali was receiving kickbacks. [Finding of Fact No. 47.] Accordingly, this factor also heavily weighs in favor of awarding some amount of punitive damages to Bajjali.

#### (iii) Degree of Culpability

The third factor that a trial court should take into account when determining the amount of a punitive damage award is the degree of culpability of the wrongdoer. *Id.* Here, Perry is solely responsible for disseminating the defamatory statements about Bajjali. [Finding of Fact No. 65.] Accordingly, this factor heavily weighs in favor of awarding some amount of punitive damages to Bajjali.

#### (iv) Situation and Sensibility of the Parties

The fourth factor that a trial court should take into account when determining the amount of a punitive damage award is the situation and sensibilities of the parties concerned. *Id.* Here, Perry sent an e-mail impugning Bajjali's business reputation, as well as accusing him of committing a crime. [Finding of Fact No. 65.] Perry then sent this e-mail to McGrath, a sophisticated businessman in the greater Houston area. [Finding of Fact No. 18.] McGrath has the capacity to further tarnish Bajjali's reputation by innocently communicating the contents of the e-mail to third–parties within the business community. However, Bajjali is still a partner in the Wallace–Bajjali partnership, and appears to be able to pursue his career in real estate despite Perry's defamatory communications. [Finding of Fact No. 78.] Moreover, unlike Wallace, there has not been any evidence introduced that Bajjali's family life was negatively affected by Perry's defamatory statements. Under these circumstances, this fourth factor moderately weighs in favor of awarding some amount of punitive damages to Bajjali.

#### (v) Extent of Offense to Public Sense of Justice and Propriety

The fifth factor that a trial court should take into account when determining the amount of a punitive damage award is the extent to which the conduct offends the public's sense of justice and propriety. *Id.* Here, Perry accused Bajjali of a "white-collar" illegalities, [Finding of Fact No. 65], as opposed to crimes that foment violence. The Court by no means intends to convey any message that it condones Per-

ry's conduct; rather, the Court intends only to convey that Perry's bad conduct, while offensive to the public's sense of justice and propriety, is not as offensive as would have been the case if he had accused Bajjali of violent crimes.[48] Accordingly, this fifth factor moderately weighs in favor of awarding some amount of punitive damages to Bajjali.

Taking all of the aforementioned factors into account—with the first three factors weighing heavily in favor and the last two factors weighing moderately in favor of awarding punitive damages—this Court concludes that an award of $25,000.00 in punitive damages to Bajjali in relation to his defamation cause of action is a reasonable award.

### (B) Determination of Wallace's Punitive Damages

#### (i) Nature of Wrongdoing

■ As noted already above, the first factor a trial court should take into account when determining the amount of a punitive damage award is the nature of the wrongdoing. *Id.* Here, Perry asserted in an e-mail that Wallace had committed extortion, gross fraud, and other serious crimes. [Finding of Fact No. 65.] Further, Perry disseminated the Blog, which contained, among other things, false insinuations that Wallace was an arms dealer and was in league with Mark Thatcher in attempting to overthrow the government of Equatorial Guinea. [Finding of Fact Nos. 75 & 76.] Moreover, Perry communicated to a number of people—the Shahs, Hoffman, Tielke, and Arora—that Wallace was receiving kickbacks. [Finding of Fact No. 47.] Accordingly, this factor heavily

weighs in favor of awarding some amount of punitive damages to Wallace.

#### (ii) Character of Conduct

The second factor a trial court should take into account in determining the amount of a punitive damage award is the character of the conduct involved. *Id.* Here, Perry sent some e-mails to one person—McGrath—asserting that Wallace had committed extortion, gross fraud, and other serious crimes. [Finding of Fact No. 65.] But there is more. Perry disseminated the Blog, which contained, among other things, false insinuations that Wallace was an arms dealer and was in league with Mark Thatcher in attempting to overthrow the government of Equatorial Guinea. [Finding of Fact Nos. 75 & 76.] Moreover, Perry communicated to a number of people—the Shahs, Hoffman, Tielke, and Arora—that Wallace was receiving kickbacks. [Finding of Fact No. 47.] These multiple acts underscore Perry's intent to destroy Wallace's business and political reputation and career; stated differently, Perry's conduct toward Wallace can be characterized as despicable. Accordingly, this factor also heavily weighs in favor of awarding some amount of punitive damages to Wallace.

#### (iii) Degree of Culpability

The third factor that a trial court should take into account when determining the amount of a punitive damage award is the degree of culpability of the wrongdoer. *Id.* Here, Perry is solely responsible for disseminating the e-mail to McGrath accusing Wallace of committing fraud, extortion and other crimes, as well as communications to several people stat-

---

**48.** At trial, Perry testified that he felt physically threatened at the Partnership's offices by Bajjali when the two of them were still partners. [Finding of Fact No. 31.] Aside from the fact that this Court does not find Perry to

be credible in this testimony, Perry never published his feelings or told third-parties that Bajjali was physically threatening him. Therefore, Perry never accused Bajjali of committing a crime of violence.

ing that Wallace received kickbacks. [Finding of Fact Nos. 47 & 65.] And, although Perry did not create the Blog, he—and he alone—ensured that the Blog was circulated to numerous individuals by instructing Hoffman, his administrative assistant and confidant, to take the necessary action to disseminate the Blog. [Finding of Fact No. 75.] Indeed, Perry had Hoffman undertake this act because he himself wanted to remain anonymous, i.e., he did not want anyone other than Hoffman to know that he was behind the distribution of the Blog. [Finding of Fact No. 75.] Under all of these circumstances, this factor heavily weighs in favor of awarding some amount of punitive damages to Wallace

### (iv) Situation and Sensibility of the Parties

The fourth factor that a trial court should take into account when determining the amount of a punitive damage award is the situation and sensibilities of the parties concerned. *Id.* Here, Perry sent an e-mail impugning Wallace's business reputation, as well as accusing him of committing a crime. [Finding of Fact No. 65.] Perry then sent this e-mail to McGrath, a sophisticated businessman in the greater Houston area. [Finding of Fact No. 18.] McGrath has the capacity to further tarnish Wallace's reputation by innocently communicating the contents of the e-mail to third–parties within the business community. Moreover, McGrath stopped participating in any business transactions with Wallace, and McGrath also resigned as trustee of the Wallace Trusts. [Finding of Fact No. 81.] Thus, Perry's actions are even more sensitive toward Wallace than Bajjali because Wallace's family life was negatively affected: the trustee of his daughters' trusts resigned; indeed, Wallace's ability to be a role model to his own daughters has been eroded. [Finding of Fact No. 83.] However, Wallace is still a

partner in the Wallace–Bajjali partnership, and appears to be able to pursue his career in real estate despite Perry's defamatory communications. [Finding of Fact No. 78.] In this one respect, Wallace, like Bajjali, has a business career that is at least still intact, if not totally stellar. However, unlike Bajjali, who was never in politics, Wallace's political career has been severely damaged due to Perry's defamatory communications. Not only did he fail to prevail in the Republican primary for Congressional District Number 22 despite having been the Mayor of Sugar Land, [Finding of Fact No. 69], his invitation to speak at the Gathering of Men was withdrawn, and the organizers of the Lincoln–Reagan Dinner not only returned Wallace's contribution to him, but declined to ask him to introduce the guest speaker at this event as he had done in the prior four years. [Finding of Fact No. 83.] Under all of these circumstances, this fourth factor very heavily weighs in favor of awarding some amount of punitive damages to Wallace.

### (v) Extent of Offense to Public Sense of Justice and Propriety

The fifth factor that a trial court should take into account when determining the amount of a punitive damage award is the extent to which the conduct offends the public's sense of justice and propriety. *Id.* Here, Perry disseminated false statements about Wallace accusing him not only of "white-collar" illegalities, [Finding of Fact No. 65], but also accusing him of crimes that foment violence, i.e., arms dealing and working with Mark Thatcher to overthrow the Government of Equitorial Guinea. [Finding of Fact Nos. 75 & 76.] Thus, unlike Perry's accusations toward Bajjali—which solely accused Bajjali of "white collar" crimes—Perry's accusations relating to Wallace covered the gamut. Accordingly, this fifth factor strongly weighs in favor

of awarding some amount of punitive damages to Wallace.

Taking all of the aforementioned factors into account—with all five factors weighing heavily in favor of awarding punitive damages—this Court concludes that an award of $100,000.00 in punitive damages to Wallace in relation to his defamation cause of action is a reasonable award.

The Court's defamation damage awards (both general and punitive) fall well within the bounds of defamation awards given by Texas state courts. *See, e.g., S & T Aircraft Accessories v. Bonnington*, No. 03-98-00648-CV, 2000 WL 13104, at *10 (Tex.App.-Austin, Jan. 06, 2000, pet. dism'd w.o.j.) (affirming compensatory damages for slander against two separate defendants for a total of $105,000.00); *Bolling v. Baker*, 671 S.W.2d 559, 569, 571 (Tex.App.-San Antonio 1984, no writ) (affirming a jury award of $64,000.00 in actual damages and $60,000.00 in punitive damages). Here, this Court is awarding more defamation damages to Wallace than to Bajjali because Wallace had more defamatory remarks published regarding him and suffered greater damage to his reputation. Indeed, Wallace's political career was effectively destroyed by Perry. [Finding of Fact Nos. 69 & 83.] Moreover, juries award higher damages when a professional's reputation—here, Wallace's political reputation—was significantly harmed. *Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 918, 927 (Tex. App.-Corpus Christi 1991, writ dism'd w.o.j.) (affirming a jury award stemming from a slander cause of action for $212,875.00 in reputation damages, $84,525.00 in past lost earnings, $19,791.66 in mental anguish damages, and $1,000,000.00 in exemplary damages); *Pruitt v. Ziesmer*, No. 14-00-00054-CV, 2002 WL 1316218, 2002 Tex.App. LEXIS 4333, at *1 (Tex.App.-Houston [14th Dist.] June 13, 2002, no pet. h.) (affirming a jury award of $570,000.00 in actual damages and $350,000.00 in exemplary damages when an arson investigator's business reputation was slandered, resulting in harm to his career), *appeal dismissed per stipulation*, No. 14-00-00054-CV, 2002 WL 31008515, at *1, 2002 Tex.App. LEXIS 6591, at *1-2 (Tex.App.-Houston [14th Dist.] Sept. 5, 2002, no pet. h.) (withdrawing the opinion after the parties settled the dispute).

### iv. Attorneys' Fees

The Plaintiffs are not eligible for attorneys' fees in relation to the defamation actions. "Attorney's fees are available when a statute or contract permits such an award." *Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 584 (Tex.App.-Austin 2003, no pet.). The Texas attorneys' fees statute does not include defamation, or any tort for that matter. TEX. CIV. PRAC. & REM.CODE ANN. § 38.001. Therefore, this Court may not award attorneys' fees in relation to the defamation causes of action.

In sum, this Court will award the following defamation damages: (1) to Bajjali, $25,000.00 in actual damages and $25,000.00 in punitive damages; and (2) to Wallace, $100,000.00 in actual damages and $100,000.00 in punitive damages.

### f. The Defamation Claims and Non-dischargeability Under 11 U.S.C. § 523(a)(6)

 Perry evidenced his willful and malicious intent to injure Wallace and Bajjali pursuant to the § 523(a)(6) analysis *supra.* For example, Prestage testified that Perry, in a fit of rage, threatened him by saying "[d]on't you f— with me, I will destroy you like I did David Wallace." [Finding of Fact No. 45.] Moreover, Perry's e-mail stating that "[t]he master is at work I have them by there balls" is further evidence of Perry's malicious intent.

[Finding of Fact Nos. 58 & 62.] In another e-mail sent to Hoffman, Perry stated "the ball has started rolling now cannot stop it about dave." [Finding of Fact No. 64.] In yet another communication evidencing his desire to harm Wallace and Bajjali, Perry stated "[Wallace] can kiss his political career goodbye." [Finding of Fact No. 62.] Finally, Kaleta testified that during a lunch meeting, Perry described his plot to serve Wallace with a lawsuit while Wallace was in chambers at Sugar Land City Hall because the publicity would destroy Wallace's career. [Finding of Fact. No. 93.]

This Court concludes that the actions described *supra,* and throughout this opinion, satisfy the willful and malicious requirement of 11 U.S.C. § 523(a)(6) because Perry's acts evidence a subjective motive to cause harm or, in the alternative, his actions had an objective substantial certainty of harm. *In re Miller,* 156 F.3d at 606. Accordingly, any damages stemming from defamation are non-dischargeable as to Wallace and Bajjali.

### 3. Fraud and Fraudulent Inducement Claims

The Plaintiffs assert that they were fraudulently induced into executing the Purchase Agreement and that Perry never intended to honor the obligations of the Purchase Agreement. The Plaintiffs argue that Perry had no intention of honoring his contractual obligations at the time he signed the Purchase Agreement. Perry, however, asserts that (1) Texas contract law bars the Plaintiffs from claiming fraud; and (2) even if the claim for fraud is valid, he intended to honor his contractual obligations.

### a. Texas Contract Law Does Not Bar the Plaintiffs' Fraudulent Inducement or Fraud Claims

Perry asserts that the fraud and fraudulent inducement claims are barred for two independent reasons: (1) the merger clause in section 9.8 of the Purchase Agreement bars the claims; and (2) the failure to perform contractual obligations is a breach of contract, not a tort.

### i. The Merger Clause

■ The merger clause in section 9.8 of the Purchase Agreement does not bar an action for fraud because it does not anticipate a release of any claims. In order for a merger clause in a contract to bar a fraud claim, the parties must have bargained for and anticipated a release of future fraud claims. *See Armstrong v. Am. Home Shield Corp.,* 333 F.3d 566, 571 (5th Cir.2003). The court in *Armstrong,* however, noted that "a fraud claim can be negated where a merger clause evinces a party's clear and unequivocal expression of intent to disclaim reliance on specific representations." *Id.* (citing *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 179 (Tex.1997)). Indeed, in each case Perry cites in support of his proposition, the merger clauses negated the fraud claims because the parties clearly and unequivocally bargained for and anticipated that the clause would negate any future fraud claims. *See Schlumberger,* 959 S.W.2d at 181; *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.,* 184 S.W.3d 840, 869 (Tex.App.-Austin 2006, pet. granted, remanded by agr.); *Armstrong,* 333 F.3d at 571.

Here, there is no evidence that either party intended to release any party for liability for fraud or fraudulent inducement. The merger clause merely states that "this agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the subject matter within." [Pls.' Ex. No. 4, § 9.8.] There is no language in the merger clause that contemplates a release of any claim arising out of the Purchase Agreement itself. Thus, this Court

concludes that the Purchase Agreement's merger clause does not negate fraud or fraudulent inducement causes of action.

### ii. Contract and Tort Elements

The Plaintiffs' causes of action for fraud and fraudulent inducement are not barred simply because the Plaintiffs base their actions on evidence that Perry never intended to honor his contractual obligations. The Texas Supreme Court has held that failure to perform the terms of a contract, by itself, is not evidence of fraud. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998). Moreover, where the only evidence of misrepresentation is the terms of the contracts themselves, there is no evidence of an actual misrepresentation. *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 596 (Tex.1992).

Perry asserts that fraud may not be raised where there is merely a breach of contract and an absence of evidence showing fraud. Although Perry correctly states the law regarding actions for fraud in relationship to a breach of contract, the Plaintiffs introduced sufficient evidence showing some elements of fraud on the part of Perry beyond the terms of the Purchase Agreement. Specifically, the "trick" e-mail provides additional evidence of fraud. [Finding of Fact Nos. 58 & 59.] Therefore, fraud and fraudulent inducement causes of action are not barred, as there is some evidence of fraud aside from a mere breach of contract.

### b. Merits of the Fraud Claims

 Despite not being barred as a matter of law, the Plaintiffs' fraud claims fail because Perry intended to honor his contractual obligations at the time the contract was entered into. "A fraud cause of action requires a material misrepresentation, which was false, and which was either known to be false when made or was as-serted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Formosa*, 960 S.W.2d at 47 (quoting *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex.1994)) (internal quotation marks omitted). A fraud cause of action may be based upon a promise of future performance that a defendant never intended to honor. *Id.* at 48. Failure to perform must be coupled with a finding of a lack of intention to perform the contract at the time of formation. *Id.* The Plaintiffs have failed to prove Perry's intent not to perform the Purchase Agreement at the time of formation.

### i. Lack of Evidence

 The Plaintiffs have not sufficiently proven that Perry had no intention of performing the Purchase Agreement at the time of formation. Proof that a defendant breached an agreement, on its own, is insufficient to show that a defendant had no intention of performance. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986). Moreover, evidence that a misrepresentation was made with no intent to perform must be relevant to a defendant's "intent at the time the representation was made." *Formosa*, 960 S.W.2d at 48 (citing *Spoljaric*, 708 S.W.2d at 434).

The Plaintiffs' evidence of Perry's lack of intent is, aside from general hostility from Perry toward Wallace and Bajjali., the "trick" e-mail. Specifically, the "trick" e-mail states, among other things, the following: "They [Wallace and Bajjali] will walk away with nothing after this week and oh Dave [Wallace] can kiss his political career goodbye. Costa [Bajjali] will be getting all the blame plus a hell of a lot of debt." [Finding of Fact Nos. 58 & 62.] Perry's statements in the "trick" e-mail are too vague for a conclusion that Perry entered into the Purchase Agreement with

no intention to perform. Indeed, not only does the "trick" e-mail fail to mention specific provisions of the Purchase Agreement that Perry allegedly did not intend to Perform, but the "trick" e-mail does not mention the Purchase Agreement whatsoever. [Finding of Fact No. 58.] The vague statements in the "trick" email are insufficient for this Court to conclude that Bajjali and the Wallace Trusts were fraudulently induced into signing the Purchase Agreement. *See id.* (concluding that fraudulent inducement occurred when, two weeks before the contract was signed, evidence was presented that showed the defendant intended to break a specific portion of the contract). Accordingly, this Court concludes that there is insufficient evidence to support a fraud or fraudulent inducement cause of action in relation to the Purchase Agreement.

### ii. Substantial Performance as Evidence of Intent

■■■ Perry substantially performed his obligations pursuant to the Purchase Agreement. In Texas, partial performance of an agreement refutes an assertion that there was no intent to perform. *See Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 445–46 (Tex.App.-Houston [14th Dist.] 1998, pet. denied). Here, Perry substantially performed the obligations of the Purchase Agreement. In the suit at bar, among other things, Perry purchased-and paid for-the other Partnership interests for $450,000.00. [Finding of Fact No. 39.] His payment of $450,000.00 reflects Perry's intent to honor the obligations under the Purchase Agreement at the time of execution.

■■■ Moreover, Perry's subsequent breach is not adequate evidence of fraudulent inducement. A person commits fraud when he enters into a contract that he does not intend to perform; a person merely breaches a contract when he enters into that contract and later decides not to perform. *See Tony Gullo Motors I, LP v. Chapa*, 212 S.W.3d 299, 304 (Tex.2006). Here, Perry performed, to a certain extent, the obligations under the Purchase Agreement and only later breached specific provisions. The breach of contract after partial performance shows that Perry intended to perform the contract in its entirety at the time he signed the Purchase Agreement.

In sum, even though Texas law allows the Plaintiffs to allege fraud and fraudulent inducement, their specific claims are without merit because Perry intended to honor the obligations under the Purchase Agreement at the time he signed this contract. Although Perry ultimately breached the terms of the Purchase Agreement, his lack of fraudulent intent at the time of contract formation precludes the Plaintiffs from recovering. Therefore, this Court will not award damages based upon a theory of fraud and fraudulent inducement.

### 4. Breach of Fiduciary Duty Claim

In order to prevail on a breach of fiduciary duty cause of action, a plaintiff must show that: (1) there was a fiduciary relationship between the plaintiff and the defendant; (2) the defendant breached his fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant. *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir.2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.-Dallas 2006, pet. denied)).

Partnerships formed after January 1, 2006, are governed by the Texas Business Organization Code (TBOC). TEX. BUS. ORGS.CODE § 402.001; *Ingram v. Deere*, 288 S.W.3d 886, 894 n. 4 (Tex.2009). The Texas Revised Partnership Act (TRPA) governs partnerships formed on or after January 1, 1994, but before January 1,

2006. Tex.Rev.Civ. Stat. art. 6132b § 11.03(a); *Ingram,* 288 S.W.3d at 894 n. 4. Here, the Partnership was formed on October 22, 2004. [Finding of Fact No. 1.] Therefore, TRPA governs.

### a. Perry Owed a Fiduciary Duty

The Texas Supreme Court has held that partners owe fiduciary duties to one another. *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 199 (Tex. 2002) (citing *Bohatch v. Butler & Binion,* 977 S.W.2d 543, 545 (Tex.1998)). Partners also owe a fiduciary duty to the partnership. *See Frazier v. Havens,* 102 S.W.3d 406, 414 (Tex.App.-Houston [14th Dist.] 2003, no pet.). A fiduciary's duties encompass a duty of good faith and fair dealing and he must place the interests of the other party ahead of his own. *Abetter Trucking Co. v. Arizpe,* 113 S.W.3d 503, 508 (Tex.App.-Houston [1st Dist.] 2003, no pet.). These duties include a duty of loyalty and a duty of care. Tex.Rev.Civ.Stat. Ann. art. 6132b § 4.04(a). "Texas courts have long held that '[i]t is axiomatic that a managing partner in a general partnership, owes his co-partners the highest fiduciary duty recognized in the law.'" *McBeth v. Carpenter,* 565 F.3d 171, 177 (5th Cir.2009) (quoting *Crenshaw v. Swenson,* 611 S.W.2d 886, 890 (Tex.Civ.App.-Austin 1980, writ ref'd n.r.e.)). Once a partnership dissolves, however, "the duty is limited to matters relating to the winding up of the partnership's affairs." *M.R. Champion, Inc. v. Mizell,* 904 S.W.2d 617, 618 (Tex.1995).

Here, Perry and Bajjali initially formed Perry Properties in 2004. [Finding of Fact No. 1.] Wallace was not personally named on the Partnership Agreement. [Pls.' Ex. No. 2.] Indeed, it was the Wallace Trusts who were the other partners in Perry Properties. [Finding of Fact No. 2.] Because the Purchase Agreement dissolved the Partnership, Perry owed a fiduciary

duty to Bajjali and the Wallace Trusts in the winding up process, but not to Wallace personally. *See Mizell,* 904 S.W.2d at 618.

### b. Perry Breached His Duties

#### i. Duty of Care

Texas law requires partners to maintain a duty of care to the partnership and other partners, stating:

A partner's duty of care to the partnership and the other partners is to act in the conduct and winding up of the partnership business with the care an ordinarily prudent person would exercise in similar circumstances. An error in judgment does not by itself constitute a breach of this duty of care.

Tex.Rev.Civ. Stat. art. 6132b § 4.04(c). A partner fulfills this duty of care in the winding up of the partnership if he "discharge[s] the partner's duties to the partnership and the other partners under this Act or the partnership agreement ... (1) in good faith; and (2) in a manner the partner reasonably believes to be in the best interest of the partnership." *Id.* § 4.04(d).

Perry breached his duty of care in relation to the winding up of the Partnership. This Court finds that Perry did not act with care an ordinarily prudent person would exercise. Perry failed to discharge Bajjali and the Wallace Trusts in good faith, pursuant to the Indemnification Clause. [Finding of Fact Nos. 99–106.] Therefore, this Court concludes that Perry breached his fiduciary duty of care in the winding up of the Partnership.

#### ii. Duty of Loyalty

A partner owes a duty of loyalty to other partners and the partnership. Tex.Rev.Civ. Stat. art. 6132b § 4.04(a). The duty of loyalty includes "refraining from ... dealing with the partnership in a

manner adverse to the partnership." *Id.* § 4.04(b).

Perry breached his duty of loyalty to the Partnership by adversely dealing with the Partnership. Perry would often refuse to attend meetings relating to the duties that Perry, the Wallace Trusts, and Bajjali owed to their investors. [Finding of Fact Nos. 29 & 41.] Although Perry knew the Partnership meetings were necessary to determine this entity's direction, he cancelled all meetings on September 9, 2006 without Wallace or Bajjali's consent. [Finding of Fact No. 36.] Perry chose to go to the movies rather than fulfilling his duties to the Partnership. [Finding of Fact No. 29.] Because Perry dealt with the Partnership in an adverse manner, the Court concludes that Perry breached his duty of loyalty to the Partnership.

#### c. Damages

 A plaintiff bears the burden of proof to show that a breach of fiduciary duty resulted in an "injury to the plaintiff or [a] benefit to the defendant." *e2 Creditors Trust v. Stephens, Inc. (In re e2 Commc'ns, Inc.)*, 354 B.R. 368, 394 (Bankr. N.D.Tex.2006). A plaintiff must also show that the defendant's breach of a fiduciary duty was the proximate cause of the injury suffered. *Id.*

#### i. Duty of Care

 The damages for Perry's breach of his fiduciary duty of care stem from his failure to indemnify pursuant to the In-

demnification Clause. Therefore, the damages analysis regarding the breach of the Indemnification Clause is applicable here. Thus, in the alternative, damages may be awarded for the cost of restructuring the various obligations of Perry Properties based on a breach of Perry's duty of care in the winding up of the Partnership.[49]

#### ii. Duty of Loyalty

 The Court will not award damages based upon Perry's breach of his duty of loyalty. The Plaintiffs did not adequately introduce sufficient exhibits and adduce persuasive testimony showing that the Partnership or the partners suffered damages as a result of Perry's breach. Thus, no damages will be awarded.

### C. Affirmative Defenses Asserted by Perry

This Court must look to the Federal Rules of Civil Procedure when addressing affirmative defenses. Fed. R. Bankr.P. 7008(c). Rule 8(c) states that parties must plead all affirmative defenses. Fed. R.Civ.P. 8(c). The Court will address the following affirmative defenses which Perry pleads.

#### 1. Clean Hands Doctrine

 In the suit at bar, the affirmative defense of clean hands is inapplicable. "The clean hands doctrine requires that one who seeks equity, does equity. Equitable relief is not warranted when the plaintiff has engaged in unlawful or inequi-

---

**49.** Even if the Indemnification Clause did not exist, this Court would find the same amount of damages, i.e., the amount of damages for breach of the Indemnification Clause, for Bajjali under a theory of breach of fiduciary duties; however, no attorneys' fees would be awarded. Finally, the Court would not award damages to the Wallace Trusts for the same reasons set forth in the subsection discussing damages relating to the breach of the Indemnification Clause; namely, because Bajjali

and the Wallace Trusts had both guaranteed the Flagship Loan and the Bank of Texas Loans, when the Wallace–Bajjali Partnership mitigated the damages by restructuring these two loans, the Wallace Trusts necessarily benefitted by such restructuring because they did not have to come out of pocket at all; only Bajjali had to come out of pocket (by using assets of the Wallace–Bajjali Partnership to achieve the restructuring).

table conduct with regard to the issue in dispute." *In re Francis,* 186 S.W.3d 534, 551 (Tex.2006) (citing *Right to Life Advocates, Inc. v. Aaron Women's Clinic,* 737 S.W.2d 564, 571–72 (Tex.App.-Houston [14th Dist.] 1987, writ denied)). A party asserting this defense must show that he, and not some third party, has been injured by the plaintiff's conduct. *Williams v. Robinson,* No. 12–08–00260–CV, 2009 WL 2356268, at *7–8, 2009 Tex.App. LEXIS 5982, at *19 (Tex.App.-Tyler, July 31, 2009, no pet.) (quoting *Omohundro v. Matthews,* 161 Tex. 367, 341 S.W.2d 401, 410 (1960)). Further, the party asserting the defense of clean hands must come to court with clean hands. *Grohn v. Marquardt,* 657 S.W.2d 851, 855 (Tex.App.-San Antonio, 1983, writ ref'd n.r.e.) (citing *Munzenrieder & Assocs., Inc. v. Daigle,* 525 S.W.2d 288, 291 (Tex.Civ.App.-Beaumont 1975, no writ)). Whether a party has come to court with clean hands is a determination left to the discretion of the trial court. *Id.* (citing *Hand v. State,* 335 S.W.2d 410, 419 (Tex. Civ.App.-Houston 1960) *writ refused per curiam,* 160 Tex. 416, 337 S.W.2d 798 (1960)).

■■■ Perry—who happens to have filthy hands as already described herein— has introduced no exhibits, and adduced no testimony, showing that Wallace or Bajjali engaged in unlawful or inequitable conduct or that Perry has been injured as the result of the Plaintiffs' conduct. Accordingly, the affirmative defense of unclean hands does not absolve Perry of liability.

### 2. Equitable Estoppel

■■■■ Perry has failed to meet the burden of proof required for equitable estoppel. Equitable estoppel is based on the principle that one who, by his conduct, has induced another to act in a particular manner should not be permitted to adopt an inconsistent position and thereby cause loss or injury to another. *See Ulico Cas. Co. v. Allied Pilots Ass'n,* 262 S.W.3d 773, 778 (Tex.2008). Equitable estoppel is established when (1) a false representation or concealment of material facts, (2) is made with knowledge—be it actual or constructive—of those facts, (3) with intention that it should be acted upon, (4) to a party without knowledge or means of obtaining knowledge of the facts, (5) who detrimentally relies on the representation. *Id.* (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 515–16 (Tex.1998)); *Schroeder v. Tex. Iron Works, Inc.,* 813 S.W.2d 483, 489 (Tex. 1991); *Frank v. Bradshaw,* 920 S.W.2d 699, 701 (Tex.App.-Houston [1st Dist.] 1996, no writ). The party asserting the defense of equitable estoppel has the burden of proving the essential elements of estoppel, and "failure to prove any element is fatal." *Mangrum v. Conrad,* 185 S.W.3d 602, 606 (Tex.App.-Dallas 2006, pet. denied) (citing *Adams v. First Nat'l Bank of Bells/Savoy,* 154 S.W.3d 859, 876 (Tex.App.-Dallas 2005, no pet.)).

In the suit at bar, Perry has failed to provide this Court with any evidence that Plaintiffs made false representations of material facts. Additionally, Perry has not shown any form of detrimental reliance on any assertions made by the Plaintiffs. Perry's vague and unsubstantiated accusations do not come within hailing distance of meeting the burden of proving all essential elements of estoppel. Therefore, Perry's defense of equitable estoppel fails.

### 3. Statute of Frauds

Perry asserts that the Plaintiffs' contractual causes of action are barred by the Statute of Frauds. In Texas, "[a] promise or agreement is not enforceable unless the promise or agreement, or a memorandum of it, is (1) in writing; and (2) signed by the person to be charged with the promise or agreement or by someone lawfully au-

thorized to sign for them." Tex. Bus. & Com.Code Ann. § 26.01(b)

The Purchase Agreement is an agreement that is in writing and signed by Perry, Bajjali, and Wallace Trusts. Accordingly, the Plaintiffs' contractual causes of action are not barred by the Statute of Frauds. The blanket Statute of Frauds defense raised by Perry is inapplicable to the provisions contained in the Purchase Agreement, and no additional evidence supports the defense.

### 4. Business Judgment Rule

Perry's use of the business judgment rule as a defense fails because the business judgment rule does not apply to partnership decisions made by partners in a partnership. "The formulation of the business judgment rule in Texas ... protects the decision of *disinterested* [corporate] directors unless there is evidence of ultra vires or fraudulent conduct." *Floyd v. Hefner*, 556 F.Supp.2d 617, 650 (S.D.Tex.2008); *see also Hoffman v. Kramer*, 362 F.3d 308, 317 n. 4 (5th Cir. 2004) (noting that generally, the business judgment rule prevents courts from questioning the business judgment of corporate directors). Here, Perry was not a corporate director; he was a partner in a partnership. Therefore, the business judgment rule is inapplicable as a defense.

In the alternative, even if the Texas business judgment rule does apply to a general partner in a partnership, it is still not a valid defense for Perry. The business judgment rule will protect the decisions of only a *disinterested* director. *Floyd*, 556 F.Supp.2d at 650. Disinterested is defined as "[f]ree from bias, prejudice, or partiality; not having a pecuniary interest." Black's Law Dictionary 481 (7th ed.1999). Perry is not disinterested. As evidenced throughout this Memorandum Opinion, Perry is not free from bias, prejudice, or partiality in relation to Wallace or Bajjali. Moreover, Perry did have a pecuniary interest in relation to his failure not to indemnify Bajjali or the Wallace Trusts, because indemnifying Bajjali and the Wallace Trusts would have required Perry to expend significant resources in restructuring the loans. [Finding of Fact Nos. 102–106.] Accordingly, because Perry is not disinterested, the business judgment rule is inapplicable.

### 5. Failure of Consideration

Perry asserts that the Plaintiffs' cause of action for breach of the Purchase Agreement is barred by the defense of failure of consideration. [Adv. Docket No. 87, p. 7, ¶ 22.] A complete failure of consideration constitutes a defense to an action on a written agreement. *See Suttles v. Thomas Bearden Co.*, 152 S.W.3d 607, 614 (Tex.App.-Houston [1st Dist.] 2004, no pet.). Failure of consideration occurs when the promised performance fails due to a supervening cause after an agreement is reached. *Stewart v. U.S. Leasing Corp.*, 702 S.W.2d 288, 290 (Tex.App.-Houston [1st Dist.] 1985, no pet.); *US Bank, N.A. v. Prestige Ford Garland Ltd. P'ship*, 170 S.W.3d 272, 279 (Tex.App.-Dallas 2005, no pet.). This Court finds that there is nothing in the record that indicates the promised performance of payment failed because of a subsequent, supervening cause. Therefore, the Court concludes that the defense of failure of consideration is inapplicable.

### 6. Defense of Payment

The defense of payment is inapplicable. The defense of payment requires all payments owed by a defendant to a plaintiff to have been made. *See State St. Capital Corp. v. Gibson Tile, Inc.*, No. Civ.A.3:97–CV–1329–P, 1998 WL 907027, at *7 (N.D.Tex. Dec.16, 1998) (denying the defense of payment when defendant had not

made all payments). Although Perry told Tielke that Wallace and Bajjali had been paid in full, Perry has failed to provide any additional evidence on this point. [Finding of Fact No. 43.] This one statement alone, especially considering Perry's lack of credibility and the very credible testimony of both Wallace and Bajjali to the contrary, is woefully insufficient. Therefore, this Court concludes that the defense of payment is inapplicable.

### 7. *Absolute or Qualified Privilege in Defamation*

 Perry does not hold an absolute or qualified privilege in the defamatory statements he made. Absolute privilege is analogous to an immunity because absolutely privileged communications are not actionable and may not form the basis for civil liability. *Randolph v. Walker*, 29 S.W.3d 271, 278 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). For defamation purposes, an absolute privilege attaches in the following circumstances:

> [When] communications [are] made in proceedings of legislative, executive, and judicial bodies, and to only a limited and select number of situations which involve the administration of the functions of the branches of government such as the opinions of judges and the speeches of members of congress or legislatures.... All communications to public officials are not absolutely privileged.

*Clark v. Jenkins*, 248 S.W.3d 418, 431–32 (Tex.App.-Amarillo 2008, pet. denied) (citation omitted); *see also Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 768 (Tex. 1987). Absolute privilege applies even if the communication was false and published with express malice. *Associated Tel. Directory Publishers, Inc. v. Better Bus. Bureau of Austin, Inc.*, 710 S.W.2d 190, 192 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.). Initial communications "to a public officer ... who is authorized or privileged

to take action" are subject to only a qualified privilege, not an absolute immunity. *Hurlbut*, 749 S.W.2d at 768.

 In this context, to be entitled to a qualified privilege, Perry's statements must have been made in good faith and communicated only to persons having a common interest or duty in the subject matter to which the communication relates. *See Grant v. Stop–N–Go Mkt. of Tex., Inc.*, 994 S.W.2d 867, 874 (Tex.App.-Houston [1st Dist.] 1999, no pet.). Qualified privilege justifies the communication only when it is made without actual malice. "Proof that a statement was motivated by actual malice existing at the time of publication defeats the [qualified] privilege." *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex.1995) (citing *Marathon Oil*, 682 S.W.2d at 631); *Bergman v. Oshman's Sporting Goods, Inc.*, 594 S.W.2d 814, 816 n.1 (Tex.Civ.App.-Tyler 1980, no writ).

 Perry does not qualify for absolute privilege. He has introduced no exhibits nor adduced any testimony indicating that his statements were made in any proceedings of legislative, executive, or judicial bodies, nor were they communicated in a situation that involved the administration of the functions of the branches of government. Perry did, however, make statements to public officials who were authorized to take action. [Finding of Fact No. 91 & 92.] Therefore, while there was no absolute privilege, Perry's defamatory statements are subject to a qualified privilege analysis.

Although Perry's communication to qualified public officials may be subject to a qualified privilege analysis, his defense still fails. This Court has already concluded that Perry made the defamatory statements with actual malice. Therefore, Perry has no qualified privilege in his defamatory statements.

### 8. All Conditions Necessary

Perry asserts that the Plaintiffs have not performed all of the conditions necessary for recovery of their causes of action and the conditions have not occurred or transpired. [Adv. Docket No. 55, ¶ 64.] However, the evidence shows unambiguously that the Plaintiffs did perform all of the conditions necessary of the Purchase Agreement. For example, Wallace and Bajjali, among other actions, relinquished their managerial positions related to Perry Properties. [Finding of Fact No. 38.] Therefore, this Court finds this defense inapplicable.

### 9. Excessive Demand as a Defense to Attorneys' Fees

 A creditor who makes excessive demand upon a debtor is not entitled to attorneys' fees for subsequent litigation required to recover the debt. *Findlay v. Cave*, 611 S.W.2d 57, 58 (Tex.1981). Demand for damages may be considered excessive even though the amount is unliquidated. *Outdoor Sys., Inc. v. BBE, L.L.C.*, 105 S.W.3d 66, 73 (Tex.App.-Eastland 2003, pet. denied). Absent some evidence of unreasonableness or bad faith, however, a demand is not excessive merely because it is greater than that which is later demanded to be due at trial. *Essex Crane Rental Corp. v. Striland Constr. Co.*, 753 S.W.2d 751, 758 (Tex.App.-Dallas 1988, writ denied).

Because Perry has failed to introduce exhibits or adduce testimony indicating unreasonableness or bad faith on the part of the Plaintiffs, this Court finds excessive demand as a limitation on attorneys' fees inapplicable.

### 10. Novation

 Bajjali's cause of action for breach of the Indemnification Clause is not barred by the defense of novation. A novation is "the substitution of a new agreement between the same parties or the substitution of a new party on an existing agreement." *Honeycutt v. Billingsley*, 992 S.W.2d 570, 576 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). "A novation agreement need not be in writing or evidenced by express words of agreement, and an express release is not necessary to effect a discharge of an original obligation by novation." *Flanagan v. Martin*, 880 S.W.2d 863, 867 (Tex.App.-Waco 1994, writ dism'd w.o.j.). Specifically, a novation can be "an inference from the acts and conduct of the parties and other facts and circumstances." *Chastain v. Cooper & Reed*, 152 Tex. 322, 257 S.W.2d 422, 423 (1953) (citing *Com. Nat'l Bank of San Antonio v. Poulos*, 8 S.W.2d 222, 224 (Tex.Civ.App.-San Antonio 1928, no writ)). Specifically, novation requires "(1) a previous, valid obligation; (2) a mutual agreement of all parties to the acceptance of a new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract." *Flanagan*, 880 S.W.2d at 867.

 While this Court acknowledges that the first prong of novation is applicable, the Wallace–Bajjali Partnership's decision to restructure the loans was not based upon a mutual agreement with Perry, thus failing to satisfy the second prong. There is no evidence of a mutual agreement between the parties accepting the debt restructuring as a new contract. In fact, Perry has testified that it is his intention to continue to honor his obligations under the Purchase Agreement. [Finding of Fact Nos. 84 & 85.] Perry also testified that he would pay any debt that he may owe Wallace and Bajjali under the Indemnification Clause. [Finding of Fact No. 86.] Furthermore, Wallace testified that Perry never gave him an indication that he would dishonor the obligations under the Purchase Agreement. [Finding of Fact No. 87.]

Second, there is no evidence that Bajjali intended to extinguish the obligations created by the Purchase Agreement. In 2008, the Wallace–Bajjali Partnership Fund assumed the debts of the Fund. [Finding of Fact No. 100. ] Because of the Fund's dismal financial state, the Wallace–Bajjali Partnership decided to restructure the Fund's loans with the intent to placate the Fund's creditors and avoid foreclosure on all of the properties. [Finding of Fact No. 98.] Moreover, there is no evidence of the validity of any new contract.

In sum, the Wallace–Bajjali Partnership's decision to restructure the loans was not based upon a mutual agreement with Perry, and there is no evidence that the Wallace–Bajjali Partnership's debt restructuring was intended to absolve Perry from the obligations of the Purchase Agreement. Thus, the Wallace Trusts and Bajjali's claims for breach of the Indemnity Clause are not barred by the defense of novation.

### 11. Waiver

Waiver is an affirmative defense proven by showing a party's "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Jernigan v. Langley,* 111 S.W.3d 153, 156 (Tex.2003) (quoting *Sun Exploration & Prod. Co. v. Benton,* 728 S.W.2d 35, 37 (Tex.1987)) (internal quotation marks omitted). It is the movant's burden to show waiver. *See El Paso Prod. Co. v. Valence Operating Co.,* 112 S.W.3d 616, 623 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In determining if waiver has occurred, "a court must examine the acts, words, or conduct of the parties, and it must be 'unequivocally manifested' that it is the intent of the party to no longer assert its right." *Robinson v. Robinson,* 961 S.W.2d 292, 299 (Tex.App.-Houston [1st Dist.] 1997, no writ).

This Court concludes that the defense of waiver to the breach of contract claim must fail. Perry did not meet his burden in showing that the Plaintiffs "unequivocally manifested" an intention to no longer assert their rights under the Purchase Agreement. Perry introduced no evidence, and adduced no testimony, showing that the Plaintiffs, through their words or actions, manifested an intention to waive their rights under the Purchase Agreement. Indeed, they have vigorously asserted their rights under the Purchase Agreement. Therefore, the defense of waiver does not apply.

### 12. Mitigation of Damages

The Plaintiffs have not failed to mitigate their damages. "The mitigation-of-damages doctrine is an affirmative defense that requires an injured party, following a breach, to exercise reasonable care to minimize his damages if it can be done with slight expense and reasonable effort." *Allen v. Am. Gen. Fin., Inc.,* 251 S.W.3d 676, 686 (Tex.App.-San Antonio 2007, pet. granted) (citing *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1,* 908 S.W.2d 415, 426 (Tex.1995)).

Mitigation of damages requires a plaintiff to exercise "ordinary care" in minimizing his damages. *Formosa Plastics,* 216 S.W.3d at 459. In a contract dispute, the party who breached the contract has the burden of proving to what extent the damaged party could have mitigated damages. *See Copenhaver v. Berryman,* 602 S.W.2d 540, 544 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.) (citing *Houston Chronicle Pub. Co. v. McNair Trucklease, Inc.,* 519 S.W.2d 924, 929 (Tex. Civ.App.-Houston [1st Dist.] 1975, writ ref'd n.r.e.)).

Perry has not met his burden of proving a lack of mitigation and the amount of damages that increased due to lack of miti-

gation. Perry produced no exhibits, and adduced no testimony, showing that Bajjali failed to mitigate his damages. Indeed, Bajjali mitigated his damages when he caused the Wallace–Bajjali Partnership to assume the debt of the Fund in 2008. [Finding of Fact No. 100.] Therefore, this Court concludes that damages were mitigated in relation to the breach of the Indemnification Clause.

■ This Court also finds that Perry failed to introduce any exhibits, or adduce any testimony, that Wallace and Bajjali were presented with opportunities to mitigate damages relating to the breach of the Nondisparagement Clause. Further, it is unlikely that Wallace and Bajjali could have done anything to mitigate those damages, as their reputations were immediately tarnished. Finally, the record does not contain any evidence of the amount of damages that could have been avoided by the Plaintiffs' failure to mitigate. For all of these reasons, failure of mitigation is not a defense to the breach of the Nondisparagement Clause.

### 13. Merger and the Parol Evidence Rule

■ The parol evidence rule does not bar the Plaintiffs' contractual causes of action. The parol evidence rule prohibits the admittance of extrinsic evidence to vary or explain the terms of a contract or the legal effect of an unambiguous contract, except under the following circumstances: (1) there was fraud; (2) an accident occurred; or (3) there was a mistake in the preparation of the contract. *Johnson v. Driver*, 198 S.W.3d 359, 363 (Tex. App.-Tyler 2006, no pet.).

Perry asserts that the parol evidence rule should bar all evidentiary support for the Plaintiffs' claims because the merger doctrine states that all referenced agreements are in writing. [Adv. Docket No. 55, ¶ 61.] Under the doctrine of merger, a prior contract merges with a subsequent contract when "the same parties to an earlier agreement later enter into a written integrated agreement covering the same subject matter." *Fish v. Tandy Corp.*, 948 S.W.2d 886, 898 (Tex.App.-Fort Worth 1997, writ denied). The merger doctrine simply triggers the parol evidence rule. *Tri–Steel Structures, Inc. v. Baptist Found. of Tex.*, 166 S.W.3d 443, 451 (Tex. App.-Fort Worth 2005, pet. denied). In order for the parol evidence rule to apply, the terms of the contract in question must be unambiguous. *Johnson*, 198 S.W.3d at 363. This Court concludes that the Purchase Agreement is unambiguous. The evidence presented by the Plaintiffs, however, does not vary or contradict the terms of the Purchase Agreement. Thus, the parol evidence rule does not bar the Plaintiffs' causes of action.

## VI. CONCLUSION

For the reasons set forth above, this Court concludes the following: (1) the Wallace Trusts do not have standing to sue; in the alternative, even if they do have standing to sue, they may not recover actual damages and attorneys' fees even though Perry breached the Indemnification Clause in relation to the Wallace Trusts and breached his fiduciary duties in relation to the Wallace Trusts; (2) Wallace, in his individual capacity, was not a party to the Purchase Agreement, and therefore Perry did not breach the Indemnification Clause or the Nondisparagement Clause in relation to Wallace; (3) Perry breached the Indemnification Clause in relation to Bajjali and is liable for actual damages and attorneys' fees; (4) in the alternative, Perry breached his fiduciary duty in relation to Bajjali and is therefore

liable for actual damages;[50] (5) Perry breached the Nondisparagement Clause in relation to Bajjali, but Bajjali failed to adequately prove up damages; (6) Perry defamed Wallace and is liable for general damages and punitive damages; (7) Perry defamed Bajjali and is liable for general damages and punitive damages; and (8) Perry is not liable to any of the Plaintiffs for fraud or fraudulent inducement with respect to the Purchase Agreement.

This Court also concludes that the following damage awards are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6): (1) actual damages, plus reasonable attorneys' fees and expenses; (2) actual defamation damages in relation to Bajjali; (3) punitive defamation damages in relation to Bajjali; (4) actual defamation damages in relation to Wallace; and (5) punitive defamation damages in relation to Wallace.

In sum, based upon the conclusions set forth immediately above, and the entire record in this Adversary Proceeding, including all of the findings of fact and conclusions of law set forth herein, this Court awards the following:

(A) *To Bajjali:* (1) $3,780,315.00 (non-dischargeable), plus reasonable attorneys' fees and expenses (non-dischargeable)[51] for breach of the Indemnification Clause; (2) $25,000.00 (non-dischargeable) in actual defamation damages; and (3) $25,000.00 (non-dischargeable) in punitive defa-

mation damages. In total, this Court awards Bajjali $3,830,315.00 in non-dischargeable damages, plus reasonable attorneys' fees and expenses (also non-dischargeable). Counsel for Bajjali is directed to submit his firm's invoices to the Court within seven calendar days of the date that this Memorandum Opinion is entered on the docket. Further, counsel for Bajjali is to submit invoices to Perry's counsel within seven calendar days from the date that this Memorandum Opinion is entered on the docket so that he can determine whether he agrees that the requested fees and expenses are reasonable or whether a separate hearing needs to be held on the reasonableness of the requested attorneys' fees and expenses.

(B) *To Wallace:* (1) $100,000.00 (non-dischargeable) in actual defamation damages; and (2) $100,000.00 (non-dischargeable) in punitive defamation damages. In total, this Court awards Wallace $200,000.00 in non-dischargeable damages. Wallace is not entitled to any attorneys' fees and costs.

(C) *To the Wallace Trusts:*—$0—

A judgment consistent with this Memorandum Opinion will be entered on the

---

**50.** Even if the Indemnification Clause did not exist, this Court would find the same amount of damages, i.e., the amount of damages for breach of the Indemnification Clause, for both Bajjali and the Wallace Trusts under a theory of breach of fiduciary duties; Bajjali would receive $3,380,315.00 in actual damages and the Wallace Trusts would receive $0. However, no attorneys' fees would be awarded to Bajjali. Additionally, these damages would be nondischargeable pursuant to 11 U.S.C. 523(a)(6) in relation to Bajjali only.

**51.** "When the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damage, including post-judgment interest, are likewise nondischargeable." *Gober v. Terra+Corp. (In re Gober)*, 100 F.3d 1195, 1208 (5th Cir.1996) (citing *Stokes v. Ferris (In re Stokes)*, 150 B.R. 388, 393 (W.D.Tex.1992))

docket simultaneously with the entry of this Memorandum Opinion.